IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| WILLIAM C. BRAMAN, MARK MENDELSON, and JOHN SIMMS, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiffs,*<br><br>- v -<br><br>THE CME GROUP, INC., THE BOARD OF TRADE OF THE CITY OF CHICAGO, THE CME EXCHANGE, INC., TERRENCE A. DUFFY, PHUPINDER GILL, BRYAN T. DURKIN and ANITA LISKEY,<br><br>*Defendants.* | No. 14 Civ. 02646<br><br>Hon. Charles P. Kocoras |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED
<u>CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................4

    1.    The CME Group's Incentive Agreements With Favored HFTs. ...........................4

    2.    The CME Group Falsely Described "Real Time" Market Data By Failing To Disclose The Latency Loophole And How It Favored HFTs ...............5

    3.    The CME Group's Incentive Agreements Helped HFTs Exploit The Latency Loophole ......................................................................................6

    4.    The Exchange Defendants' Relaxation Of Their Enforcement Of The Prohibitions On Wash Sales, Helped HFTs To Exploit The Latency Loophole ..........................................................................................6

    5.    The Materiality Of The Misstatements About The Real Time Data Was Exacerbated By The Exchange Defendants' Direct Market Access And Co-Location Agreements, And Disclosures ..........................................................7

    6.    Defendants Falsely Denied Reports Of The Existence Of The Latency Loophole ..........................................................................................8

    7.    Because The Commodity Markets Are A "Zero Sum Game", Defendants' Bad Faith Conduct Knowingly Permitted And Caused The Favored HFTs To Gain And Plaintiffs And Class Members To Lose............................................9

ARGUMENT ........................................................................................................10

    A.    Plaintiffs Have Alleged Plausible Claims Under the CEA ....................................10

        1.    Plaintiffs have sufficiently alleged bad faith as required by 7 U.S.C. 25(b)(4) .......................................................................10

        2.    Plaintiffs have not disregarded the CEA's limitations on private causes of action .......................................................................14

        3.    Plaintiffs have more than adequately pled a cause of action against Defendants for manipulation under 7 U.S.C. §9 and CFTC Rule 180.1 .......................................................................16

        4.    Plaintiffs have pled a cause of action for false information under 7 U.S.C. §9...........................................................................19

5.  Plaintiffs more than adequately pled a cause of action against the CME Defendants and Individual Defendants for violations of 7 U.S.C. §§25(b)(1) and 25(b)(2) ............................................................20

6.  Plaintiffs have sufficiently alleged damages for the purposes of their CEA claims.....................................................................................22

7.  Plaintiffs have more than adequately pled a cause of action against Defendants for aiding and abetting manipulation in violation of 7 U.S.C. §1 et seq.......................................................................................24

B.  PLAINTIFFS HAVE ALLEGED PLAUSIBLE ANTITRUST CLAIMS............26

1.  Plaintiffs Have Alleged Facts Which Raise A Plausible Inference Of A Violation Of Sherman Act § 1. ........................................................27

   a.  Plaintiffs Have Plausibly Alleged That The CME Defendants Combined, Conspired Or Otherwise Reached An Unreasonable Agreement In Restraint Of Trade With HFTs In Violation Of Sherman Act § 1, And That Defendants Materially Benefitted From The Same..........................................................................27

   b.  Plaintiffs Have Alleged Unreasonable Restraints Of Trade Which Damaged Competition In The Relevant Market For Exchange Services. ......................................................................29

2.  Plaintiffs Have Plausibly Alleged Violations Of § 2 Of The Sherman Act For Monopolization And Attempt To Monopolize.............................31

3.  Plaintiffs Plausibly Alleged A Price Discrimination Claim Under Sherman Act § 13(a). .................................................................................33

4.  Plaintiffs Have Adequately Alleged Antitrust Injury And Have Standing Under § 15 Of The Sherman Act To Bring Damages Claims Against CME Defendants For Violations of §§ 1, 2 and 13(a) Of The Sherman Act........................................................................34

C.  PLAINTIFFS COMMON LAW CLAIMS ARE SUSTAINABLY PLED...........35

1.  Plaintiffs Adequately Pled A Cause Of Action Against Defendants For Fraud....................................................................................................35

2.  Plaintiffs Have Adequately Pled A Cause Of Action For Unjust Enrichment. ...............................................................................................36

a.      Legal Standard for Unjust Enrichment. .........................................36

b.      "Benefit" is Broadly Construed ....................................................37

c.      Plaintiffs Have Demonstrated the Need for a Constructive
         Trust. ...........................................................................................38

D.     PLAINTIFFS ADEQUATELY PLEAD FRAUDULENT CONCEALMENT
        WHICH TOLLS THE STATUTE OF LIMITATIONS .......................................38

1.     Plaintiffs Plead Sufficient Particularity To Toll The Statute Of
        Limitations. ...............................................................................39

2.     Defendants Seek to Apply an Inappropriate Heightened Pleading
        Standard. ...................................................................................39

3.     Defendants Are Equitably Estopped From Asserting the Statute
        of Limitations. ............................................................................40

CONCLUSION.................................................................................................40

## PRELIMINARY STATEMENT

Because Defendants[1] fail to carry their movants' burden,[2] their motion to dismiss[3] should be denied in all respects. Plaintiffs have no burden on Defendants' motion. Taking Plaintiffs' fact allegations as true and drawing reasonable inferences in Plaintiffs' favor, as is required on a Rule 12(b)(6) motion, *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), Plaintiffs adequately allege plausible[4] claims.

Further, since the filing of the challenged complaint, important facts and information from news reports and other sources continue to be revealed. *See* Ex. A hereto.[5] These ongoing disclosures provide important additional facts which Plaintiffs could now plead in order to further support their allegations and claims. To any extent that any portion of any claim is found to be lacking in any respect, Plaintiffs respectfully request leave to replead same based on the extensive and on-going new revelations about Defendants' conduct. *See* Fed. R. Civ. P. 15(a)(2); *Fuhrer v. Fuhrer*, 292 F.2d 140, 142 (7th Cir. 1961).

**Violations of Sections 1 and 2 of the Sherman Antitrust Act.** Between January 1, 2005 and April 10, 2014 ("Class Period"), the Exchange Defendants (see fn. 1) possessed, abused, and discriminatorily exercised monopoly power over the market for exchange services in

---

[1] Defendants are CME Group, Inc. ("CME Group"), Chicago Board of Trade ("CBOT"), Chicago Mercantile Exchange Inc. ("CME"), Terrance A. Duffy ("Duffy"), Phupinder Gill ("Gill"), Bryan T. Durkin ("Durkin") and Anita Liskey ("Liskey"). *See* Second Amended Complaint, Dkt. No. 25 ("SAC") ¶¶ 17-18.
    "Exchange Defendants" means the CME Group and the CME with respect to CME futures and options, and the CME Group and CBOT with respect to CBOT futures and options.
[2] *Compare* 5B Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2010 Supp.) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable clam for relief exists"), *with In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 629 (7th Cir. 2010) *cert. denied,* 131 S. Ct. 2165, 179 L. Ed. 2d 937 (U.S. 2011).
[3] Defendants' Memo. In Support Of Their Motion To Dismiss Plaintiffs' Second Amended Complaint, Dkt. No. 46 ("Def. Br.").
[4] *In re Text Messaging,* 630 F.3d 629 (plausible means only a non-negligible chance that an agreement was made or other operative fact occurred).
[5] This includes the Indictment in *United States v. Coscia*, No. 14-CR-00551 (N.D. Ill. Oct. 1, 2014) https://ia801405.us.archive.org/1/items/ gov.uscourts.ilnd.301298/gov.uscourts.ilnd.301298.1.0.pdf.

the Exchange Defendants' futures and options contracts. Exchange services consist of the execution of transactions, and provision of timely market data, and extends to rule-making, surveillance and rule-enforcement (*i.e.*, self-regulatory functions). SAC ¶¶120-57.

For example, the Exchange Defendants (through the CME Group) entered multiple incentive agreements with favored High Frequency Traders ("HFTs"). ¶¶19, 47, 56-69. The Exchange Defendants made other agreements in restraint of trade and otherwise abused their monopoly powers to favor HFTs as described in the Statement of Facts #5 below. The Exchange Defendants' foregoing abuses of monopoly power and agreements in restraint of trade injured competition and violated Sections 1 and 2 of the Sherman Act. *See* Section B *infra.*

This included by proximately causing Plaintiffs' and Class members' transactions in Exchange Defendants' Defendants' futures and options to be executed at worse, artificial prices and the favored HFTs' transactions to be executed at better prices. SAC ¶¶ 48, 52, 64, 83, 92-94.

**Violations of the Commodity Exchange Act and State Law Prohibitions On Unjust Enrichment.** Separately, the Exchange Defendants and other Defendants made public representations during the Class Period that were rendered misleading by Defendants' failures to disclose numerous material facts. For example:

- Defendants failed to disclose the Exchange Defendants' discriminatory incentive payment agreements with favored HFTs. ¶¶56-69.
- Defendants failed to disclose the critical "latency loophole" characteristic of the CME Group's falsely named "real time" market data and the important ways in which this characteristic favored HFTs. ¶¶40.
- Defendants failed to disclose the Exchange Defendants' changes in their enforcement of the prohibitions against wash sales and the important ways that these changes favored HFTs. ¶¶40, 70.

- Defendants failed to disclose the other material facts described below and the ways in which they favored the HFTs at the expense of Plaintiffs and the Class. SAC ¶¶ 56-77.

The anticompetitive and unlawful effects of Defendants' foregoing conduct included the following. They favored the HFTs by allowing them systematically to trade in Exchange Defendants' futures and options ahead[6] of Plaintiffs and the Class, and engage in non-competitive wash sales. *See* fn. 7 *infra*. This proximately caused Plaintiffs and the Class the injury of paying or receiving worse execution prices in the Exchange Defendants' commodity futures and options contracts. Defendants' unlawful conduct also unjustly enriched Defendants and their HFT co-conspirators at the expense of Plaintiffs and the Class. This unjust enrichment occurred, in part, because of the HFTs' unprecedented trading volumes.

The HFTs' enormous trading volumes increased the per contract fee revenues of the Exchange Defendants. SAC ¶48. Also, various Exchange Defendants' employees, directors or personnel who worked for, partially owned or otherwise were affiliated with the favored HFTs. SAC ¶ 64 n.34. Such trading volumes included extremely large volumes of unlawful wash sales,[7] reportedly reaching as much as 50% of the trading volume on the CME and CBOT, and 30% of Defendant CME Group's revenues. SAC ¶ 48.

---

[6] Trade ahead, as used here, means the various ways by which HFTs unfairly obtained better prices and disadvantaged Class Members. *See, e.g.*, the description of the "Latency Loophole" at pp. 4-5 and fn.9; *compare* SAC ¶¶4, 10, 10n.2, 43, 52, 66, 79.

[7] Wash sales are a noncompetitive form of trading. In 1936, the United States Congress outlawed wash trades with the passage of the Commodity Exchange Act, calling the activity "pure, unadulterated fraud." SAC ¶ 47. While Defendants enacted further prohibitions against wash trades in November 2013, what they created were "Self-Match Prevention Measures", which made compliance with the anti-wash sales provisions of the CEA and exchange regulations voluntary. This made enforcement against certain preferred market participants ephemeral at best, and Defendants used the fact of this optional compliance as a further incentive to employ HFT manipulative techniques that would remain untraceable. SAC ¶¶ 49-50, 54. For example, a trader (or algorithm) enters large orders on the market (highest buy price or lowest sell price) with the intent to drive prices in its favor and then to cancel them before they can be executed. These orders cause other traders to think the price of a particular contract is moving higher, in the case of

In the latter regard, this is the first CEA bad faith claim against an exchange since the commodity exchanges became profit seeking, publicly traded companies. An overarching additional indication of bad faith here that was absent in prior cases is as follows. The Exchange Defendants caused and permitted large abuses --- *e.g.,* trading ahead and wash sales --- that inflated the number of contracts traded and, therefore, inflated the per-trade fees and revenues of the Exchange Defendants.

## STATEMENT OF FACTS

**1. The CME Group's Incentive Agreements With Favored HFTs.** As Defendants appear to concede, Plaintiffs adequately allege numerous undisclosed incentive agreements pursuant to which the Exchange Defendants paid stipends and granted rebates for transactions made by favored HFTs in CME options and futures. Def. Br. at 3, 10-13, 24. The ostensible purpose was to encourage liquidity in newly-introduced futures contracts or options or established ones in which trading was inactive or trading volume was low. But Defendants instead used these clandestine agreements to turbocharge massive HFT trading volume in already well-established or already actively traded futures or options that the preferred HFTs wanted to

---

a buy order, or lower, in the case of a sell order. Trader/algoritm would take advantage of the market reaction by entering orders to sell at the higher price or buy at the lower price, then when the favorable orders have been filled at the trader's "better" price, the trader immediately enters a new order to clear the opposite side of the market where the spoofing orders sit. The trade may be large to completely take out the resting order (and drive the market in the opposite direction in order to allow a favorable exit of the previous trades) or may only be a single 1-lot. Either way, the action of the matching engine when it observes opposite orders at the same price will be to cancel the resting (spoofed) orders before any other trade executions can take place. The CME matching engine actually cancels the resting orders of the aggressor BEFORE allowing any trades to match, so it is IMPOSSIBLE for another trader to act on the new trade information and execute a trade against the spoofed orders-all to the benefit of the spoofer. http://www.cmegroup.com/globex/trading-cme-group-products/smart-match-faq.html

trade.[8]  SAC ¶¶1, 11-12, 47, 56-66, 78, 81, 85.  Defendant CME Group has given out 341 private

incentive agreements as of 2014, up from 56 such agreements in 2010. SAC  ¶¶65-66.[9]

### 2. The CME Group Falsely Described "Real Time" Market Data By Failing To Disclose The Latency Loophole And How It Favored HFTs

The CME Group also charged market participants during the Class Period for access to

what Defendants described as "real-time" market data. ¶¶40, 46, 82. [10]  Defendants assured

market participants that this data was being delivered at the exact same time and manner to all

other paying market participants in what Defendants described as an "equal playing field".  ¶78;

*see* Ex. B hereto.  But these representations were false due to a "Latency Loophole." ¶¶70-88.

The Latency Loophole arises because executed orders and prices are reported to the person who

executes same faster than other data is reported to other users.

This allowed HFTs to know that orders they entered were executed and at what price, and

to enter many subsequent orders, all before the rest of the market participants found out the

status of their own initial orders.

---

[8]  Plaintiffs allege that Defendants have entered into clandestine incentive/rebate agreements in established and heavily traded contract markets with favored firms such as DRW Trading Group and Allston Trading, which were paid up to $750,000.00 per month to trade in one of the most heavily traded futures contracts in the world, Euro Dollar Futures Contracts.  ¶58.  The existence of these clandestine agreements in Eurodollar futures was only revealed on June 19, 2014 in a Bloomberg article entitled *Perks Live Forever at CME Amid Review of Trade Incentives*. http://www.bloomberg.com/news/print/2014-06-19/perks-live-forever-at-cme-amid-review-of-trade-incentives.html. SAC ¶58.

[9]  The existence of these clandestine agreements first began to leak out to the public in March 2014 through the S-1 filing by HFT firm Virtu Financial Inc., which contained the disclosure that the: "CFTC is looking into our trading during the period from July 2011 to November 2013 and specifically our participation in certain incentive programs offered by exchanges or venues during that time period." SAC ¶63.  https://www.sec.gov/Archives/edgar/data/1592386/000104746914002070/a2218589zs-1.htm#dm16701_business.

[10]  According to Defendant CME Group's list of authorized distributors of CME Group market data, there are currently over 200 distributors authorized to distribute "real-time" CME market data.  Defendant CME Group charges $12,000 for an annual license for "real-time" market data for any one of four exchanges, CME, CBOT, NYMEX, or COMEX, according to CME Group Schedule 5: Fee Schedule (2014).

Continuously entering orders and obtaining confirmations of the price at which these orders are filled, before the rest of the public even knows about the executed trades, enables HFTs that are able to utilize the Latency Loophole with a massive informational and time advantage in discerning actual price, market direction and order flow before anyone else. SAC ¶¶38-39.

Thus, the falsely named "real-time" market data was effectively stale data. ¶46. This was because other, preferred market participants – HFTs - had been given access to the same data sufficiently in advance so that HFT algorithms could enter multiple further transactions ahead of market participants transacting only on "real-time" market data. *Id.*

### 3. The CME Group's Incentive Agreements Helped HFTs Exploit The Latency Loophole

The Latency Loophole incentivized HFTs to put in multiple orders to buy and sell in order to receive virtually continuous executions and a virtually continuous information advantage. ¶11. But the use of multiple orders could be cost-prohibitive because of the per contract transaction fees for each executed trade. Enter the CME Group's undisclosed incentive agreements. They provided undisclosed rebates and subsidies to the HFTs that reduced trading costs and helped ameliorate this potential cost problem. Thereby, they enabled the HFTs to further exploit the undisclosed latency loophole.

### 4. The Exchange Defendants' Relaxation Of Their Enforcement Of The Prohibitions On Wash Sales, Helped HFTs To Exploit The Latency Loophole

The foregoing combination of advantages, incentivized and empowered the HFTs to put in multiple orders to buy and sell in order to obtain a continuous stream of faster information from "real time" data and continuous ability to trade ahead of Plaintiffs and Class members. Again, as soon as any one order would be executed, the informational advantage under the "real time" system would be triggered.

However, another problem of an HFTs simultaneous buy and sell orders was that they caused the HFT buy from or sell to itself, *i.e.,* to make an unlawful wash sale. *See* fn. 7 *supra.* Indeed, on March 18, 2013, former CFTC Commissioner Bart Chilton stated that the CFTC had found out that "they [wash sales] are going on at this large, voluminous level. I mean, to me, a shocking level." SAC ¶¶48 n.20, 53. By the end of the Class Period, some experts estimated that fifty percent of the Exchange Defendants' total trading volume was from wash sales, and that such HFT transactions accounted for up to thirty percent of the CME Group's revenue SAC ¶¶12 n.4, 48, 54.

Beginning by 2012, the Exchange Defendants substantially relaxed their enforcement of the prohibition against wash sales. In 2013, they announced changes in the reporting requirement by exchange members of wash sales. ¶12, n.4. This further allowed the HFTs to continue to provide high wash sale volume which increased Exchange Defendants' income and helped the HFTs obtain their information advantages over Plaintiffs and the Class. *Id.*

### 5. The Materiality Of The Misstatements About The Real Time Data Was Exacerbated By The Exchange Defendants' Direct Market Access And Co-Location Agreements, And Disclosures

During the Class Period, Defendants began offering a specialized level of access to market data known as Direct Market Access ("DMA"). ¶5. This greatly enhanced the effectiveness of the HFT algorithms to the detriment of other market participants.[11] HFTs gained yet a further important speed advantage when Defendant CME announced on October 11, 2011 that it would be opening a new, state-of-the art colocation facility in Aurora, Illinois on January 29, 2012. In that announcement, Defendant Durkin asserted: "Our new CME Co-Location

---

[11] DMA allows some market participants to enter orders directly into the exchange's trade or order matching engine for execution, bypassing other system checks and balances that would delay the data transmission by enough time so that an HFT without such delay using DMA could gain a sufficient enough advantage so as to enter hundreds of transactions through such HFT's computer algorithms. This system, as its name implies, unfailingly provided its owner with faster entry of orders than the order entry time of persons who did not have Direct Market Access. SAC ¶45 n.14 & n.15.

Services provide fair and equal access by offering all customers equal pricing, the same terms and conditions, as well as equal lengths of fiber between customer cabinets and the CME Globex platform or connections to carriers…"[12]

What Defendants at no time revealed was that the new colocation facilities would never produce "fair and equal access" as promised by Defendant Durkin. This was because the preferred HFTs had the Latency Loophole which provided an undisclosed ability to act on price data before all other market participants. For example, even if the non-preferred market participants paid for collocation services, they would be unable to compete on a level playing field because of the preferred HFTs' use of the undisclosed Latency Loophole. SAC ¶79.

The anticompetitive effects of the Latency Loophole coupled with faster informational reports and co-location were as follows. The favored HFTs were able to see non-public price information first and to act on it in a way as to deceive all other market participants. Among this arsenal of illegal conduct is the systemic utilization of spoofing, engaging in wash trades and trading ahead of all others. All of these strategic create price information that is not the result of supply and demand but the cheating behavior itself. ¶¶79,107; *see* Ex. C hereto (illustrating HFTs trading ahead).

6. **Defendants Falsely Denied Reports Of The Existence Of The Latency Loophole**
Rather than immediately disclose all market participants about the Latency Loophole or at least disclose that certain traders with access to high speed transactional algorithms and DMA could take advantage of all the others in the marketplace, Defendants continued to cover up the existence of the Latency Loophole. SAC ¶¶40, 44-45. They instead used the Latency Loophole as a private marketing tool to promote higher trading volume by certain preferred HFTs. *Id.*

---

[12] http://www.futuresmag.com/2011/10/11/cme-will-offer-colocation-sevices-jan-9, *see* SAC ¶¶44-46. According to Defendant CME Group's "Connectivity Options – 2014", the cost for the top-level connectivity of 10Gb is currently $12,000 per month, with a $2,000 installation fee.

The Latency Loophole first began partially to be exposed in a May 1, 2013 WSJ article. SAC ¶¶39, 39 n.9 and 40. But Defendants deliberately continued thereafter to mislead market participants as to the seriousness of the problem and the actual facts surrounding how the Latency Loophole came into existence and how it could lead to manipulative and anticompetitive results on the Defendant Exchanges. SAC ¶¶70-77.

The Defendants foregoing course of conduct allowed the HFTs to engage in preferential order placement, electronic front-running, rebate arbitrage, slow-market arbitrage, wash sales, spamming, spoofing, and/or quote spamming on the Exchange Defendants' exchanges. SAC ¶107. http://wallstreetonparade.com/2014/07/wall-streets-regulators-sell-out-on-illegal-wash-sales/

7. **Because The Commodity Markets Are A "Zero Sum Game", Defendants' Bad Faith Conduct Knowingly Permitted And Caused The Favored HFTs To Gain And Plaintiffs And Class Members To Lose**

Unlike the stock markets, commodity futures and option trading are "zero sum games". That is, the market actually has an offsetting loss for every gain in each commodity futures contract. SAC ¶¶1, 39, 39 n.10. The CME Group sold the foregoing products and exercised its monopoly power so as to enable the HFTs to achieve gains. For example, HFT firm **Virtu Financial, Inc**. disclosed in its SEC Form S-1 filed March 10, 2014 that it had experienced only one losing trading day out of the **last 1238 trading days**. SAC ¶63, 64 n.34. In the zero sum game of commodity futures trading, the Class unnecessarily lost as a result of the guaranteed revenues.

These two anticompetitive effects --- guaranteed winners and guaranteed losers --- represent a severe injury to competition. The competition in the commodity futures markets previously had been based on equal information. Here the effect of allowing preferred HFTs to see market information in advance of other market participants was to move prices in small

increments in favor of these HFTs while at the same time to ensure that other market participants

would lose accordingly. The final prices then become determined not by successfully predicting

future market direction or by other skill or acumen, but by the rigged system created by

Defendants' discriminatory exercise of their monopoly power, agreements in unreasonable

restraint of trade, and on-going misrepresentations and non-disclosures.

The incredible performance of Virtu and other HFTs tracked an equally impressive

increase in the Exchange Defendants' revenues from greatly increased HFT transaction volume.

¶61. In other words, the HFTs and Exchange Defendants knowingly profited from the losses of

Plaintiffs and the Class.

## ARGUMENT

### A. Plaintiffs Have Alleged Plausible Claims Under the CEA
### 1. Plaintiffs have sufficiently alleged bad faith as required by 7 U.S.C. 25(b)(4)

Defendants assert that Plaintiffs do not allege bad faith with the particularity required by

Rule 9(b). Def. Br. at 18-19. Supposedly, all that Plaintiffs assert is a conclusory allegation that

Defendants "profited" from the alleged wrongful activities and that CME and CBOT "violated

their duties as self-regulatory entities and opted instead to maximize profit opportunities". *Id.*

Defendants mischaracterize the clear allegations of the Complaint and the law regarding

sufficiently pleading bad faith in order to make out a claim under §25(b)(4). Contrary to

Defendants' assertions, the Complaint is replete with allegations that fully supports a plausible

inference of bad faith.

Defendants conspicuously fail to cite the controlling case of *Bosco v. Serhant*, 836 F.2d

271, 278 (7th Cir. 1988). Therein, the Court of Appeals held that "if an exchange's regulation

imposes a duty that the exchange *should* know is being flouted, the exchange is acting

wrongfully... sufficient under the cases we have cited to demonstrate bad faith." [emphasis in

original].  Plaintiffs have alleged in detail that the Exchange Defendants knew, empowered,

caused, and concealed that the favored HFTs were violating the wash sale prohibitions, the

trading ahead prohibitions, and systematically receiving information faster than other market

participants.  Plaintiffs hereby clarify that the Exchange Defendants knowingly failed to enforce

for the ulterior motive of obtaining profits the Exchange Defendants' following rules: CBOT and

CME Rules 402 (Business Conduct Committee) (specifically the required treatment of

manipulations), Rules 530 (Priority of Customers' Orders), Rules 531 (Trading Against

Customers' Orders Prohibited), Rules 532 (Disclosing Orders Prohibited); and Rules 534 (Wash

Trades Prohibited).

Next, *Sam Wong & Son, Inc. v. New York Mercantile Exch.*, 735 F.2d 653, 677 (2d Cir.

1984):

> The Commodity Exchange Act, which embodies the statutory model of exchange
> self-regulation, mandates that we strike a balance that does not insulate exchange
> officials from answering serious questions posed by injured traders. To do
> otherwise would drastically curtail the private right of action deemed essential to
> the regulatory framework established by Congress. Therefore, when self-interest
> or other ulterior motive unrelated to proper regulatory concerns is alleged to
> constitute the sole or the dominant reason for the exchange action, a complaint is
> sufficient even though the action was not beyond the bounds of reason.

*See DGM Inv., Inc. v. New York Futures Exch., Inc.*, 265 F.Supp.2d 254, 261 (S.D.N.Y. 2003)

(citing to *Sam Wong* and finding that plaintiffs were entitled to discovery to substantiate their

claims since plaintiffs had alleged financial interests motivated defendants and along with other

actions made "it likely that more than mere negligence and inattention took place."); *Minpeco,

S.A. v. Hunt*, 693 F.Supp. 58, 61 (S.D.N.Y. 1988) ("self-interest or other ulterior motive

unrelated to proper regulatory concerns must constitute the sole or dominant reason for the

exchange action or inaction."); *Strobl v. New York Mercantile Exch.*, 561 F.Supp. 379, 382-83

(S.D.N.Y. 1983) ("In general, 'bad faith' means 'ulterior motive.'… Plaintiff alleges that the

Exchange knew of the conspiracy and intentionally violated the CEA and its own rules in order to further the conspiracy. Plaintiff alleges further that defendants 'withheld certain information ... that should have been made known to the public,' … If these allegations are taken as true, the conclusion fairly may be reached that the Exchange had an 'ulterior motive.' We therefore hold that the complaint sufficiently pleads bad faith.") (references and citations omitted); *see also Bosco v. Serhant*, 836 F.2d 271, 278 (7th Cir. 1988) (citing to *Sam Wong*, the court stated: "if an exchange's regulation imposes a duty that the exchange *should* know is being flouted, the exchange is acting wrongfully… sufficient under the cases we have cited to demonstrate bad faith.") (emphasis original).

Where courts have found inadequate allegations of bad faith, it has been when the facts before the court allowed the reasonable presumption of a valid regulatory reason to take certain action, or that there were insufficient allegations of ulterior motive. Defendants' cases are all in these categories.[13] Defendants also assert that "Rule 9(b) applies to Section 22(b)'s bad faith requirement," Def. Br. at 18, but do not point out that their cited cases found the allegations

---

[13] *See, e.g.*, *Brawer v. The Options Clearing Corp.*, 807 F.2d 297, 303n.9 (2d Cir. 1986) ("We do not mean to foreclose the possibility that disparate treatment of essentially identical financing schemes might be so arbitrary as to constitute constructive bad faith. However, in this case, Brawer has not alleged a sufficient identity between the two plans to induce us to second-guess the Securities Committee's conclusion."); *Vitanza v. Board of Trade of the City of New York*, No. 00 CV 7393 (RCC), 2002 WL 424699, at *6-*7 (S.D.N.Y. Mar. 18, 2002) (citing to *Sam Wong*, "the Complaint is devoid of factual allegations that any of the NYBOT Defendants even traded in the P-Tech or in any way stood to benefit from Eisler's alleged scheme to manipulate settlement prices…but instead, may be a result of negligent indifference."); *Western Capital Design, LLC v. New York Mercantile Exch.*, 180 F.Supp.2d 438, 441 (S.D.N.Y. 2001) (where allegations were only that exchange failed to enforce its floor rules, and no proper showing of bad faith was made that exchange possessed "wrongful knowledge with a motive ascribable to malfeasance"); *aff'd*, *Western Capital Design, LLC v. New York Mercantile Exch.*, 25 Fed.Appx. 63, 65 (2d Cir. 2002) ("the alleged ulterior motive, such as self-interest, financial gain or personal animosity, must be a substantial or motivating factor in the exchange's action or inaction" [and then citing to *Sam Wong*]); *Grossman v. Citrus Assocs.*, 706 F.Supp. 221, 229 (S.D.N.Y. 1989) ("there is no allegation that the exchange or any of its members (who are not named as defendants) knew of that scheme…").

sufficient on much less particularized pleadings than in the Amended Complaint or involved

distinguishable facts involving exercise of exchange discretion in emergency situations.[14]

Plaintiffs satisfy many of the foregoing judicially recognized ways to allege bad faith.

*See* Statement of Facts *supra.* Plaintiffs allege that Exchange Defendants entered incentive

agreements, relaxed enforcement against wash sales, made false statements and false denials, and

omitted to disclose facts in order to empower and subsidize favored HFTs to take advantage of

the undisclosed Latency Loophole, and to transact using non-public price information. *Id.*

Plaintiffs allege how the Exchange Defendants profited from theise improper activities,

SAC ¶7, and how Defendants duped the purchasers of supposed "real-time" market data. SAC

¶8. Plaintiffs allege how Defendants profited from side agreements with certain HFTs, SAC ¶9,

and permitted them to execute trades using non-public data. SAC ¶10. Plaintiffs also allege how

Defendants entered into secret incentive agreements with certain HFTs, allowing them to

transact at non-published, lower rates that were not available to or known by other market

participants and to receive rebates, SAC ¶11, and that Defendants knew about the preferred

HFTs making extensive use of wash trades, baiting, spoofing and other manipulative and

prohibited practices. SAC ¶12.

Plaintiffs allege with greater particularity the Latency Loophole and the manner in which

Defendants allowed certain preferred HFT clients to take illegal advantage of the rest of the

market in order to generate high volume and more revenues for the Exchange Defendants. SAC

¶¶38-46. Plaintiffs also allege with particularity how Defendants knowingly permitted and

---

[14] *See, e.g. Grossman, supra*, 706 F.Supp. at 229 (""To be sure, bad faith is the standard applicable to an exchange's acts [citing to *Sam Wong*]; and these general averments of condition of mind pass muster under Rule 9(b)); *Jordon v. NYMEX*, 571 F. Supp. 1530, 1537 (S.D.N.Y. 1983) (regarding emergency exchange actions, the court cited Judge Weinstein's observation in *P.J. Taggares Co. v. New York Mercantile Exchange,* 476 F.Supp. 72, 77n.22 (S.D.N.Y.1979) that "bad faith means ulterior motive, for example, personal gain.").

indeed encouraged the illegal and manipulative practice of wash trades and other manipulative conduct that would swell the transaction volume on the Exchange Defendants and increase profitability while at the same time illegally disadvantaging other innocent market participants. SAC ¶¶47-69. Plaintiffs further allege that Defendants embarked on a deliberate campaign of making material misrepresentations and omissions about the illegal conduct taking place on the exchanges, assuring regulators and the investing public that the futures markets were free of the same illegal and manipulative activities that Defendants were in secret encouraging in order to increase their profits and market share. SAC ¶¶70-77.

While Defendants contend that these material misrepresentations and omissions made by the Individual Defendants[15] are not actionable because they occurred after the end of the Class Period, Def. Br. 15-16, in fact the examples given in the Amended Complaint were only the most recent examples of a deliberate and fraudulent course of conduct and concealment employed by the Individual Defendants throughout the Class Period. *See* Ex. B attached hereto.

## 2. **Plaintiffs have not disregarded the CEA's limitations on private causes of action**

Each of the CME and the CBOT each are a "registered entity" under the Commodity Exchange Act. 7 U.S.C. §1(a)(40). The Chicago Board of Trade and the Chicago Mercantile Exchange are both Designated Contract Markets under 7 U.S.C. §7, and Defendant CME Group was created through the merger of contract markets. "Section 22(a) [of the CEA, 7 U.S.C. §25] relates to claims against persons other than registered entities and registered futures associations.

---

[15] Defendants properly identify the Individual Defendants as "officers of the Exchanges." For example, Defendant Duffy serves as Executive Chairman and President of the CME, Inc., Defendant Phupinder serves as CEO of the CME, Inc., Defendant Durkin serves as COO and Managing Director-Products & Services of the CME, Inc., and Defendant Liskey has served as Managing Director, Corporate Marketing & Communications of the CME, Inc. from 2002 until the present. Defendant Durkin also held a variety of leadership roles at Defendant CBOT until the merger with Defendant CME Group in 2007, ending up as Executive Vice President and COO, while Defendant Liskey served as a Director of Defendant CBOT from 1989 to 1995.

Section 22(b) deals with claims against those entities and their officers, directors, governors,

committee members and employees." *Klein & Co. Futures, Inc. v. Board of Trade*, 464 F.3d 255,

259 (2nd Cir. 2006). The remedies afforded by 7 U.S.C. §25(b) are available only to a private

litigant "who engaged in . . . transaction[s] on or subject to the rules of" a contract market. *Id.* at

260. Defendants are correct that subsection 25(b) does have a "bad faith" requirement: "A

person seeking to enforce liability under this section must establish that the registered entity  [or]

officer, … acted in bad faith in failing to take action or in taking such action as was taken, and

that such failure or action caused the loss." 7 U.S.C. § 25(b)(4). As described in detail *infra*,

Plaintiffs have alleged with particularity the bad faith shown by the Exchange Defendants

throughout the Class Period.

The Exchange Defendants had superior knowledge of the price of the contracts being

sold, due to the fact that their core purpose under the CEA was to manage the buying and selling

of these very contracts, and act as a clearinghouse for them.[16] In this superior position, they "sell

this price information as accurate present and real-time price and order information.

Alternatively, this information is included by the payment of exchange fees." SAC ¶ 36.

Defendants next claim that Plaintiffs do not allege any rule or regulation that Defendants

failed to enforce. This is incorrect, as Plaintiffs plainly allege:

> The CBOT and CME are contract markets registered with the Commodity Futures
> Trading Commission ("CFTC"). They are required pursuant to 7 U.S.C. § 7(d)(2)

---

[16] Defendants claim that Plaintiffs fail to allege any facts to suggest that Defendants, or any third party, had the ability to manipulate the market price of any commodity. Def. Br. at 8. Defendants misapprehend the function of contract markets. Commodity Futures trading serves three legitimizing purposes: 1. Price discovery; 2. Reduction in price volatility; 3. Efficient and fair risk transfer. Cargill v. Hardin, 452 F.2d at 1153. Defendants had the ability to cause changes in prices so as to defeat each of the three foregoing legitimizing purposes of commodity futures trading. This includes through Defendants' agreements with the HFTs, Defendants' on-going furtherance of the HFTs' manipulative practices (including wash sales, trading ahead, and the other manipulative practices), and Defendants misrepresentations and omissions relating to the latency loophole, incentive agreements with the HFTs, and other material facts.

to regulate themselves in conformity with the CEA and all regulations enacted by the CFTC, including what are termed "Core Principles," such as the Prevention of Market Disruption, the Protection of Markets and Market Participants, and the listing of Contracts Not Readily Subject to Manipulation. Accordingly, the CME and CBOT are required to operate in accordance with the strictures of the CEA, in addition to obeying prohibitions against anticompetitive and other wrongful behavior in restraint of trade as provided for under the federal antitrust laws, 15 U.S.C.§§1 *et seq.*

SAC ¶3; *see also* SAC ¶¶30, 67.

### 3. Plaintiffs have more than adequately pled a cause of action against Defendants for manipulation under 7 U.S.C. §9 and CFTC Rule 180.1

Defendants assert that Plaintiffs do not claim to have traded in the subject markets. To the contrary, the Amended Complaint states that each of the named Plaintiffs "purchased and/or sold futures contracts at the CBOT and CME during the Class Period and was damaged by Defendants' allowance and facilitation of a marketplace manipulated by HFTs and by his reliance on what was falsely represented to him as real-time market data." SAC ¶¶16(a) – (c). While Plaintiffs believe that these allegations are sufficient to give standing for the claims made in the Amended Complaint, Plaintiffs now supplement these pleadings by providing further transaction details and market data purchases for the named Plaintiffs during the Class Period. *See* Exhibit D hereto.[17]

Defendants assert that Plaintiffs' first cause of action must fail because Plaintiffs' use of the word "manipulation" is conclusory at best and that the allegations in the complaint bear no resemblance to a recognizable claim for manipulation, Def. Br. at 9-14. Defendants take an indefensibly narrow view of the circumstances under which a manipulation may be found which

---

[17] The provision of such further information, enhancing but not fundamentally changing any of the allegations contained in the Amended Complaint, is permitted under Seventh Circuit precedent. *See, e.g.*, *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir. 1994); *Early v. Bankers Life and Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) (Posner, J.) ("a plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment.")

flies in the face of clear precedent under the CEA. Congress' *raison d'etre* for enacting and repeatedly enhancing the CEA has been "to deter and prevent price manipulation."[18] Importantly, Congress views actions by private plaintiffs seeking redress for violations of the CEA as "critical to protecting the public and fundamental to maintaining the credibility of the futures markets." *Cange v. Stotler & Co.*, 826 F.2d 581, 594-595 (7th Cir. 1987) (citing to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57).

In the foregoing context, Congress expressly provided in the CEA that persons who "purchased or sold a [futures] contract" may recover their "actual damages resulting from" a manipulation of "the price of such [futures] contract." 7 U.S.C. §25(a)(1). Thus persons who purchased or sold futures contracts on any of Defendants' exchanges clearly have standing under 7 U.S.C. §25 and may recover their "actual damages resulting from" Defendants' manipulation of the price of futures contracts as alleged in the Amended Complaint.

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982), the Supreme Court stated that: "throughout the long history of federal regulation of futures trading it has been federal law that has imposed a stringent duty upon exchanges to police the trading activities in the markets that they are authorized by statute to regulate." *Id.* at 393. As the Court then went on to find: "Having concluded that exchanges can be held accountable for breaching their statutory duties to enforce their own rules prohibiting price manipulation, it necessarily follows that those persons who are participants in a conspiracy to manipulate the market in violation of those rules are also subject to suit by futures traders who can prove injury from these

---

[18] *See* CEA § 3, 7 U.S.C. §5 (the "purpose" of the CEA is to "deter and prevent price manipulation"); *see also Leist v. Simplot*, 638 F.2d 283, 315, n. 7 (2d Cir. 1980), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-67, 382-95 (1982) *citing* Conference Report to 1974 amendments, 120 Cong. Rec. 34997 (Oct. 10, 1974) (Sen. Talmadge) (CEA is "remedial legislation").

violations." *Id.* at 394,[19] *see also Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8ᵗʰ Cir. 1971)

("The methods and techniques of manipulation are limited only by the ingenuity of man.").

Defendants claim that Plaintiffs have failed to plead the required elements of a fraud-

based manipulation under 7 U.S.C. §9(1) or CFTC Rule 180.1, Def. Br. at 12, but Defendants

constrain the definition of what can constitute a manipulation on the commodities markets to

unrealistic and narrow examples. *See* Def. Br. at 9-14 *passim.*[20]  In fact, the discussion contained

in the CFTC publication of Final Rules regarding manipulation under Dodd-Frank and cited by

Defendants (Def. Br. at 12n.7 and 13n.8), makes it abundantly clear that the definition of

manipulation should be given broad interpretation to give best effect to the remedial goals set by

Congress.[21]

---

[19]  *See Volkhart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5ᵗʰ Cir. 1962) ("Manipulation is, 'any and every operation or transaction or practice…calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets…Any and every operation, transaction (or) device, employed to produce these abnormalities of price relationship in the futures markets, is manipulation.") (footnote omitted); *see also Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8ᵗʰ Cir. 1971) ("The methods and techniques of manipulation are limited only by the ingenuity of man."); *In the Matter of Anthony J. DiPlacido*, CFTC Docket No. 01-23 (C.F.T.C.), Comm. Fut. L. Rep. 30970, 2008 WL 4831204, at *24 (Nov. 5, 2008) (same).

[20]  Defendants cite to cases that have nothing in common factually with the allegations of the Amended Complaint. *See, e.g., CBOT v. SEC*, 187 F.3d 713 (7ᵗʰ Cir. 1999) (petition by Defendant CBOT seeking review of SEC determination not to approve the creation of futures contracts based upon the Dow Jones Utilities and Transportation Averages); *Frey v. CFTC*, 931 F.2d 1171 (7ᵗʰ Cir. 1991) (suit for attorneys' fees arising out of much earlier case regarding an attempted squeeze of the wheat market using, in part, substantial quantities of wheat futures on the Defendant CBOT); *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8ᵗʰ Cir. 1971) (scheme by corporation and four of its officers to manipulate the wheat futures market on Defendant CBOT by orchestrating a squeeze near the close); *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) (scheme to manipulate the price of rice futures contracts and options during a nine month period on Defendant CBOT in part by violating position limits); *In re Soybean Futures Litig.*, 892 F. Supp. 1025 (N.D. Ill. 1995) (excessive speculation in Defendant CBOT's soybean futures contracts leads to issuance of CBOT emergency order); *In the Matter of Marathon Petroleum Co., LLC*, CFTC No.07-09, 2007 WL 8044624 (C.F.T.C. Aug. 1, 2007) (elements when pleading specific commodity manipulation).

[21]  *See generally* the CFTC's Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 17 C.F.R. Part 180, RIN Number 3038-AD27, Vol. 76, No. 135, pages 41398-411 (July 14, 2011).[21]  The CFTC even spoke to the precise kind of manipulative behavior alleged in the Amended Complaint, stating: 'The Commission declines to adopt comments requesting heightened supervision of algorithmic and automated trading systems as beyond the scope of this rulemaking. Nevertheless, as a general matter, a supervisory failure may be one of the facts

In line with the CFTC's release regarding the enactment of Rule 180.1, Plaintiffs have also met the manipulation pleading standard for securities cases. *See, e.g.*, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim…This standard meets the goals of Rule 9(b) while also considering which specific facts a plaintiff alleging manipulation can realistically plead at this stage of the litigation.") (citations omitted); *see also In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 533-36 (S.D.N.Y. 2008).

### 4. Plaintiffs have pled a cause of action for false information under 7 U.S.C. §9

Plaintiffs rely on 7 U.S.C. §9(1)(A) (and not 7 U.S.C. §9(2), *compare* Def. Br. at 16-17), "Special provision for manipulation by false reporting", which provides:

> Unlawful manipulation for purposes of this paragraph shall include, but not be limited to, delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

Here Plaintiffs have clearly alleged that Plaintiffs paid Defendants for data and price information based upon representations from Defendants about such data and price information, which thereby induced Plaintiffs into trusting in the supposed value of such data and price information. SAC ¶¶99-101. These allegations were given further particularity, where, for example, Plaintiffs specifically allege that during the Class Period: (i) the Exchange Defendants held themselves out as providing bona fide real-time market data, when in reality they were

---

and circumstances that the Commission considers in determining whether a violation of the final Rule exists." *Id.* at 41406.

making side agreements with certain HFTs that would increase their profitability while disadvantaging their innocent customers, SAC ¶9; (ii) Defendants concealed from Plaintiffs and the Class that they were not really providing real-time market data, including concealing the existence of the Latency Loophole, while continuing to collect fees for such supposed information, SAC ¶40; made undisclosed incentive agreements with HFTs to assist them, (iii) the Exchange Defendants continued to charge exchange and data fees to the Class while continuing to represent that they provided a transparent and unmanipulated trading market at the same time as they were continuing to make preferential agreements with HFTs to increase Defendants' profits to the detriment of the Class, SAC ¶69.

Plaintiffs also allege that at the same time that Defendants were profiting from the sale of such data and price information, they were encouraging HFTs to exploit the Latency Loophole to manipulate the futures market to the HFTs' advantage. SAC ¶¶44-46. Defendants duped the purchasers of such data and price information into thinking that they were purchasing the best such data and price information available, such that they would be put on an equal informational footing with any other market participants. *Id.* Defendants were further aided through the unlawful scheme by the continued dissemination by the Individual Defendants of assurances that the futures markets were fair for all participants and that no one group possessed an edge by faster access to better information than was available to the rest of the market. SAC ¶52, 70-77.

**5.** **Plaintiffs more than adequately pled a cause of action against the CME Defendants and Individual Defendants for violations of 7 U.S.C. §§25(b)(1) and 25(b)(2)**

Defendants first assert that Plaintiffs disregarded the CEA's limitations on private causes of action, arguing that actions can only be brought against "a registered entity, board of trade, or a registered futures association, and their respective officers, directors, governors, committee members, or employees." Def. Br. at 5. While Defendant CME Group Inc. does not technically

meet the exact description of any of those categories, the Individual Defendants are directors and/or officers of Defendant CME Group Inc., and also Defendant CBOT, which is certainly included (*see* fn.5 *infra*), as is Defendant CME, Inc., in the categories of entities subject to private action under the provisions of 7 U.S.C. §25.

Plaintiffs argue that as the sole parent and 100% owner of Exchange Defendants CBOT and CME, Inc., Defendant CME Group should be liable under the provisions of 7 U.S.C. §25 for the actions that it takes through its wholly-owned exchange subsidiaries, and for the actions that it takes in its own name that directly affect the policies and activities of those exchange subsidiaries. Furthermore, all Individual Defendants occupy senior management and communication roles, directly impacting the nature, scope and implementation of the material misrepresentations and omissions as alleged in the Amended Complaint.

The CEA also creates a federal law with a wide purposive scope that imposes liability for an individual or corporate entity for "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office ...," 7 U.S.C. § 2(a)(1)(B); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986). [22] Alleging that the "act, omission, or failure of any …other person acting for any … corporation", should be construed purposively to further the CEA's overarching

---

[22] Defendant CME Group should be liable under 7 U.S.C. §25, both under the doctrine of *respondeat superior* and by piercing the corporate veil: "In some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir. 1995). Courts pierce the corporate veil "to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l,* 2 F.3d 24, 26 (2d Cir. 1993) Veil piercing determinations are fact-specific and are highly sensitive to "the circumstances of each case." *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988). "[A] parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." *Thomson–CSF,* 64 F.3d at 778 (citing *Carte Blanche,* 2 F.3d at 29); *see also MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 63 (2d Cir.2001) (listing ten relevant factors and quoting *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir.1997)); *see also In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 532-33 (S.D.N,Y. 2008).

objective of preventing manipulation and fair and orderly markets in which the public can transact with confidence.  Here there can be no doubt about the total commonality of interests and profit motivation between Defendant CME Group and all of the other Defendants, and the total control over policies and procedures maintained by Defendant CME Group over each and every one of the other Defendants.

Defendants offer no plausible basis for their alleged actions that could have any other purpose but wrongly to enrich Defendants for violating their regulatory duties and failing to enforce the rules and regulations of the exchanges and the CFTC.  The Exchange Defendants were statutorily required to have in place provisions for the "prevention of market manipulation" and other important market safeguards, SAC ¶104, and to have rules "designed to prevent fraudulent and manipulative acts and practices" as well as to promote just and equitable principles of trade, SAC ¶105.  Exchanges that fail, in bad faith, to comply with these statutory provisions are liable for actual damages, SAC ¶106, and that Defendants' conduct as alleged in the Amended Complaint violated their obligations to enforce rules relating to market and financial integrity and stability on many levels, SAC ¶107.

### 6.  Plaintiffs have sufficiently alleged damages for the purposes of their CEA claims

Defendants claim that Plaintiffs have failed to plead requisite loss and loss causation.  Def. Br. at 20.   Contrary to Defendants, there is no loss causation requirement under the CEA, and: "[w]hile Plaintiffs may have a difficult time proving 'actual damages,' that is a fact-intensive inquiry for another day." *In re Crude Oil Commodity Futures Litig.*, 913 F.Supp.2d 41, 61 (S.D.N.Y. 2012).  In other words, in commodity futures manipulation cases, Plaintiffs are not expected to plead how they sustained actual damages unless information has become publicly available that shows exactly when the impact on prices occurred.

In fact, Plaintiffs have pled that each of the three named Plaintiffs traded on Exchange

Defendant CBOT and/or Exchange Defendant CME, and suffered losses thereby. SAC ¶¶16(a) –

(c). Plaintiffs have now further particularized those losses. *See* Exhibit A. Furthermore,

Defendants misapprehend the pleading requirements for damages and loss causation at the

pleading stage in a CEA manipulation case. Plaintiffs have pled throughout the Amended

Complaint the existence of a relationship between certain preferred HFTs and Defendants,

whereby those HFTs were enabled and encouraged for mutually profitable reasons to manipulate

futures contract prices received by innocent market traders so as to impose an effective

transaction tax, making all such prices received by such innocent market traders artificial by their

very nature. SAC ¶¶39 n.9.

Defendants assert that the Amended Complaint provides only a formulaic recitation that

an artificial price existed, citing to SAC ¶92. Def. Br. at 11. But alleging an artificial price is

NOT required under Section 180.1. LOOK AT BRIEFS IN BRENT CRUDE OIL. Moreover,

the SAC does allege that the Latency Loophole caused trades to be made at artificial prices. SAC

¶¶50, 92-97. Defendants rely on *In re Soybean Futures Litig.,* 743 F.Supp. 827 (N.D. Ill. 2010),

for the narrow proposition that a price is only artificial if it does not reflect the market or

economic forces of supply and demand. As the *Soybean* court also recognized, however,

"Congress' decision to prohibit manipulation without defining it apparently arose from the

concern that clever manipulators would be able to evade any legislated list of proscribed actions

or elements of such a claim." *Id.* at 1044. "As a result, manipulation cases tend to be

characterized by fact-specific, case-by-case analysis." *Id.*

Moreover, courts have found that when plaintiffs have transacted at artificial prices,

injury may be presumed. *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379-

80 (S.D.N.Y. 2010). When, as here, Plaintiffs have alleged a course of manipulative conduct and collaboration leading all the way up to senior management of major commodities exchanges, the harmful effect of such conduct may be presumed regarding all innocent market participants. *Kohen v. PIMCO LLC*, 244 F.R.D. 469, 474 (N.D. Ill. 2007). In such circumstances under the CEA, courts have found the *Dura* loss causation requirement prevalent in typical securities cases to be inapplicable, and as one court observed:

Here, Plaintiffs have alleged that they transacted in a rigged, artificial market and specifically alleged all of the means by which the market became rigged, with indications of volumes of as much as 50% unlawful wash sales. When persons transact in such a rigged market, it is plausible to infer that they suffered injury. Further, absent discovery into the actual trading data of the exchanges, Plaintiffs cannot know when the wash sales, trading ahead, and other deleterious practices were happening. Because it was not "practicable" for Plaintiffs to plead more than they have, Plaintiffs pleading should suffice even under the more stringent requirement for pleading securities actions.

### 7. **Plaintiffs have more than adequately pled a cause of action against Defendants for aiding and abetting manipulation in violation of 7 U.S.C. §1 et seq.**

Defendants assert that there is no private cause of action against a registered entity for aiding and abetting a primary violation, citing only to 7 U.S.C. §§ 25(b)(1) and (b)(5) and offering no case support. Thus, according to Defendants, Defendants CME and CBOT must be dismissed from this claim, Def. Br. at 14. Defendants concede that their theory of limited liability does not exonerate Defendant CME Group. *Id.* Subsection 25(b)(1)(C) specifically provides for registered entity liability where "any registered entity that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation or order…" (emphasis supplied). Subsection 25(a)(1)(D) also provides liability for any non-

registered entity person who purchased or sold a futures contract or an option on such contract if the "violation of this chapter" constitutes: (i) the use or employment of, or an attempt to use or employ, in connection with…a [futures] contract…on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate…"; and (ii) "a manipulation of the price of any such contract…"  In the context of Section 25, and the clear remedial purposes of the CEA, it would make no sense whatsoever to limit a private right of action for violating the anti-manipulation provisions of the CEA to claims against individuals, but at the same time to bar private causes of action against the very registered entities that instructed and colluded with such individuals in the commission of their actionable manipulative activities.[23]  Furthermore, Subsection 25(b)(2) specifically provides liability for registered futures associations if such an entity "fails to enforce any bylaw or rule that is required…or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order…" (emphasis supplied). Again, given the scope of coverage intended by referring to "this chapter," as well as to "any Commission rule, regulation, or order," it would be incongruous if the Exchange Defendants could escape aiding and abetting liability.

Plaintiffs' claim for aiding and abetting manipulation against the Individual Defendants and Defendant CME Group is brought under 7 U.S.C. §1 et seq., which includes 7. U.S.C. §25(a)(1) and creates liability for "[a]ny person ... who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter...."  Plaintiffs have alleged in great detail

---

[23]   The legislative history of the Act confirms that its "fundamental purpose ... is to insure fair practice and honest dealing on the commodity exchanges," S.Rep. No. 93–1131, at 1, 14 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5844, 5856, and to encourage commodity pool operators, trading advisors, and other CEA-registered entities to engage in honest dealing that reflects well on the commodities markets, S.Rep. No. 95–850, at 12–13 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2101 (discussing the trend in federal regulation toward "encouraging honest and sound dealing and strengthening public confidence in the nation's rapidly expanding futures markets").

how all of the Defendants worked closely together throughout the Class Period to achieve all of the illegal and manipulative results formulated and ordered by Defendant CME Group and the Individual Defendants serving as directors and/or officers of both Defendant CME Group Inc. and the Exchange Defendants. *Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998),

### B. PLAINTIFFS HAVE ALLEGED PLAUSIBLE ANTITRUST CLAIMS

Defendants seek dismissal of Plaintiffs' antitrust allegations, claiming that such allegations are "threadbare" and thus "fail to meet the pleading standards necessary to state a Sherman Act claim." Def. Br. at 21-27. Specifically, Defendants posit that Plaintiffs lack standing due to a purported failure to plead antitrust injury, as well as other deficiencies in terms of relevant factual allegations. Contrary to these contentions, Plaintiffs have alleged the specific facts needed to raise a plausible inference of unreasonable agreements in restraint of trade between the CME Defendants and various HFTs which directly, materially and foreseeably damaged Plaintiffs and competition in the market for exchange services for Exchange Defendants' futures and options, including execution and clearing of transactions, the provision of market data, and rule-making, surveillance and rule-enforcement. These restraints constitute a *per se* violation of Sherman Act § 1. Alternatively, Plaintiffs have alleged sufficient facts under the "Rule of Reason" and "quick-look" approaches. Moreover, Plaintiffs plausibly alleged facts which tend to show that Defendants attempted to and did successfully monopolize the relevant market for exchange services and discriminated between market participants under §§ 2 and 13(a), respectively. For all the foregoing and following reasons, Plaintiffs respectfully request that this Court reject Defendants' motion to dismiss Plaintiffs' antitrust claims.

1. **Plaintiffs Have Alleged Facts Which Raise A Plausible Inference Of A Violation Of Sherman Act § 1.**

In order to state a claim for relief under § 1 of the Sherman Act, Plaintiffs must only plead facts which plausibly support the inference of three necessary elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v Nat'l Coll. Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quotations omitted). In accordance with these well-established standards, Plaintiffs' complaint contains numerous, specific factual allegations which tend to show that Defendants abused their power in the relevant market for exchange services by developing a discriminatory trading system, agreeing to provide HFTs with exclusive price and unexecuted order flow data before anyone else, and allowing such HFTs to co-locate their servers with the CME's servers which further assisted them in executing manipulative trades in this market. These behaviors benefitted Defendants and their co-conspirators while injuring Plaintiffs and the putative class.

### a. Plaintiffs Have Plausibly Alleged That The CME Defendants Combined, Conspired Or Otherwise Reached An Unreasonable Agreement In Restraint Of Trade With HFTs In Violation Of Sherman Act § 1, And That Defendants Materially Benefitted From The Same.

First, Plaintiffs have clearly alleged agreements between CME Defendants and HFTs in restraint of trade. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("*Leegin*") ("Section 1 . . . prohibits every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states"). Specifically, Defendants agreed to empower the HFTs to abuse the latency loophole by providing them with exclusive access to DMA data, which allowed HFTs to leverage such information to disadvantage class members. SAC ¶¶ 38-40, 45-56, 66, 68. The CME Defendants also agreed to allow HFTs to co-locate their servers directly next to the CME's servers, thereby providing an additional unfair advantage in terms of the speed at which information could be analyzed and employed to pick off Plaintiffs' unexecuted trades on the Exchange Defendants' exchanges. *Id.* The CME incentivized HFTs for

entering countless orders and illicit wash sales, through the payment of rebates and stipends, which would have been cost prohibitive to any other market participant attempting to ascertain price trends. SAC ¶¶ 47-48, 50, 56, 58-66. Finally, Plaintiffs allege that Defendants agreed to permit the HFTs to circumvent the CME's own amended wash sale rules by making their compliance with such rules farcically "voluntary." ¶¶ 49, 54.

CME Defendants repudiated their responsibility and explicit promise to provide fair and equal access to a marketplace free of manipulation to everyone, thus "secretly positioning" class members at the wrong end of a "zero-sum game" and generating supracompetitive profits for themselves and HFTs. SAC at ¶¶ 39, 45-48, 52-68. By garnering favor with the HFTs and perpetuating a false image of volume in the relevant market for exchange services, the Exchange Defendants attracted increased volume from other market participants who viewed the illicit activity as earnest liquidity, which in turn increased revenue, profits, the CME stock price and income for individual Defendants via performance awards. ¶¶ 47-48, 50, 56, 58-66. ("W]ithout the discounts and agreements . . . to favored HFTs, along with occurrence of wash trades, the volume numbers . . . would be dramatically lower, and their profits would be greatly diminished"). In placing profit motives ahead of their responsibility to guarantee a fair and orderly marketplace, Defendants unlawfully excluded competitors, directly and materially injured the class, and reduced competition in the exchange services market. ¶¶37, 47-48, 54-55.

In light of the foregoing, numerous and specific allegations concerning the Exchange Defendants' unequivocally anticompetitive agreements with HFT's - which lack any reasonable *pro*competitive explanation - as well as the "secretive" nature of antitrust conspiracies, Defendants' call for greater specificity at this stage of the litigation is specious. *Cf.* Def. Br. at 25-26, *with U.S. v. Snow,* 462 F.3d 55, 68 (2d Cir.2006) ("conspiracy by its very nature is a

secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in

court with ... precision") (citations omitted), *cert. denied,* 549 U.S. 1150 (2007), *and with*

*Michelman v. Clark–Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.1976)

("Conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven

through inferences that may fairly be drawn from the behavior of the alleged conspirators").

### b. Plaintiffs Have Alleged Unreasonable Restraints Of Trade Which Damaged Competition In The Relevant Market For Exchange Services.

"Courts have established three categories of analysis—per se, quick-look, and Rule of

Reason—for determining whether actions have anticompetitive effects." *Agnew*, 683 F.3d 335

(citing *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 779 (1999)). "All of these methods of analysis

are meant to answer the same question: 'whether or not the challenged restraint enhances

competition.'" *Id.* (quoting *Cal. Dental* at 780; *NCAA v. Bd. of Regents,* 468 U.S. 85, 104

(1984)). Plaintiffs have plausibly alleged that Defendants' illicit agreements with HFTs had

anticompetitive effects on the relevant market for exchange services for futures and options

under all three categories of analysis, and have damaged, rather than enhanced, competition.

To justify a *per se* prohibition, an alleged restraint must have "manifestly

anticompetitive" effects, *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50 (1977),

and "lack ... any redeeming virtue." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery &*

*Printing Co.,* 472 U.S. 284, 289, (1985) (quotations omitted). By treating categories of restraints

as necessarily illegal, the *per se* rule eliminates the need to study the reasonableness of an

alleged restraint in light of the market forces at work. *Business Electron. Corp. v. Sharp*

*Electron. Corp.,* 485 U.S. 717, 723 (1988). As a consequence, the *per se* rule is typically saved

for instances, such as here, where "courts can predict with confidence that it would be

invalidated in all or almost all instances under the rule of reason." *Leegin* 551 U.S. 886.

Under a Rule of Reason analysis, Plaintiffs must ultimately prove "that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. "[F]actors to take into account include specific information about the relevant business and the restraint's history, nature, and effect," as well as whether Defendants have "market power." *Leegin* at 885 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). Although Plaintiffs have not yet had discovery, Plaintiffs have adequately alleged a relevant market consisting of exchange services for Exchange Defendants' futures and options, including the execution and clearing of transactions, the provision of market data, and rule-making, surveillance and rule-enforcement (*i.e.*, self-regulatory functions). *E.g.*, SAC ¶¶2, 30, 33. As more fully set forth in Part B.2 below, Defendants abused their monopoly power in this market to unlawfully excluded competitors, reduce competition and cause supracompetitive prices. ¶¶39, 47-48, 50, 54-55, 66; *see also Leegin* at 886 ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest"). Such allegations are sufficient to make out a claim under the Rule of Reason.

Finally, the quick-look analysis "can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements [] would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine potential procompetitive justifications." *Agnew*, 683 F.3d at 336 (quoting *Cal. Dental,* 526 U.S. 779). Under this approach, if no legitimate justification for facially anticompetitive behavior is found, a market power analysis is unnecessary and the court "condemns the practice without ado." *Chicago Prof'l Sports Ltd. P'ship v. N.B.A.,* 961 F.2d 667, 674 (7th Cir. 1992). Any procompetitive justification for Exchange Defendants' agreements with HFTs is belied by their

repeated misstatements and omissions concerning the existence and efficacy of such agreements given the latency loophole. SAC ¶¶ 36, 39, 40-54, 70-88. Indeed, Defendants' attempted to conceal this information so that they could continue realizing supracompetitive profits from their exclusionary conduct. *Id.*

> **2. Plaintiffs Have Plausibly Alleged Violations Of § 2 Of The Sherman Act For Monopolization And Attempt To Monopolize.**

Under § 2 of the Sherman Act, Plaintiffs must plead (1) that Defendants possessed monopoly power in the relevant market, and (2) that they engaged in predatory or exclusionary behavior to acquire of maintain that power; or (1) that Defendants had a specific intent to achieve monopoly power, (2) that they engaged in predatory, exclusionary or other anticompetitive conduct directed at accomplishing their unlawful purpose, and (3) that there is a dangerous possibility that Defendants' attempt to monopolize will be successful. 15 U.S.C. § 2; *U.S. v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966).

"[A] seller who has a large market share may be able to charge a price persistently above the competitive level despite the existence of competitors." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) (citation omitted); *Grinnell* at 571 ("The existence of such power ordinarily may be inferred from the predominant share of the market"). Plaintiffs have alleged that the Exchange Defendants, collectively "the world's largest derivatives exchange," made anticompetitive agreements with HFTs which "assisted them to monopolize the market for providing derivatives trading in the United States." SAC ¶¶ 8, 147-52 (this further "increased [their] trading, market power, and ability to control prices and restrict output"). Specifically, Defendants possessed, abused, and discriminatorily exercised monopoly power over the market for exchange services for Exchange Defendants' futures and options including

execution and clearing of transactions, the provision of market data, and rule-making, surveillance and rule-enforcement (i.e., self-regulatory functions).

"The second element of each claim can be met by showing that [Defendants] engaged in predatory or anticompetitive conduct of some kind." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (citations omitted); *State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.,* 935 F.2d 1469, 1481 (7th Cir.1991) ("Section 2 forbids . . . the employment of unjustifiable means to gain [monopoly] power"). The Complaint plausibly alleges such conduct, including exclusionary actions by a monopolist which altered the dynamics of competition in the market by: (i) providing selected, preferred traders with an informational advantage over other traders; (ii) offering incentives and rebates solely to preferred HFTs in return for increased (real and illusory) order flow; and (iii) allowing HFTs to enter countless spoof and wash trades which, perversely, portrayed a false image of liquidity and fairness to other market participants. Thus, Defendants should not be heard to assert that the antitrust laws gave them the "right" to prefer certain traders and exclude others from access to the fastest data and trade execution methods. For example, in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), a Section 2 violation was found where a newspaper refused to sell advertising to patrons of its only local competitor, a newly-established radio station:

> The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. But the word "right" is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.

*Id*. at 155 (citation omitted). One such qualification is monopolists may not act with impunity in conveying competitive advantages to one corner of the market in preference of another.

For another example, in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, (1985), the owner of a skiing facility brought a § 2 claim against the owner of three of the four adjacent facilities after the latter discontinued its participation in a jointly-offered, interchangeable "all-Aspen" lift ticket. The Court upheld liability in part because "the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* at 603. The defendant's behavior was properly characterized as exclusionary, considering its effect not only on the plaintiff, but also "its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Id.* at 604-05 ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory").

**3.** **Plaintiffs Plausibly Alleged A Price Discrimination Claim Under Sherman Act § 13(a).**

Plaintiffs alleged that the CME Defendants have violated Sherman Act § 13(a) by "discriminat[ing] in price between different purchasers of commodities of like grade and quality." SAC ¶143; *accord* ¶¶11,47-48, 56-69. Defendants attempt to discredit this claim, arguing that "Plaintiffs' claim fails as a matter of law because none involves a commodity." Def. Br. at 26-27 (citations omitted). However, Defendants fail to acknowledge that two of the leading authorities in this area, the Commodity Exchange Act the CFTC, expressly include and/or include by reference the following in defining a commodity: "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt." 7 U.S.C. § 1a(9); *see also* <u>CFTC Glossary</u>[24] (Citing CEA § 1a(9) and reciting the same definition). Contrary to Defendants, this definition makes clear that Congress intended to include commodity exchange services and derivatives under the definition of commodities.

---

[24] Available at: http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/index.htm#C.

**4. Plaintiffs Have Adequately Alleged Antitrust Injury And Have Standing Under § 15 Of The Sherman Act To Bring Damages Claims Against CME Defendants For Violations of §§ 1, 2 and 13(a) Of The Sherman Act.**

Defendants' motion to dismiss relies heavily on Plaintiffs' purported failure to allege any antitrust injury. Def. Br. at 22-24. To the extent Defendants imply that Plaintiffs must allege a horizontal conspiracy between competitors, they are mistaken. The "general rule" is "that parties are non-competitors does not preclude the formation of a conspiracy." Philip E. Areeda, Herbert Hovenkamp, Antitrust Law (2014 Ed.) ("Areeda & Hovenkamp"), ¶1402b.

Antitrust injuries must be "of the type the antitrust laws were intended to prevent and that flow from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *accord* Areeda & Hovenkamp, ¶ 391a, at 320 ("A private plaintiff must identify the economic rationale for a business practice's illegality under the antitrust laws and show that its harm flows from whatever it is that makes the practice unlawful"). As construed by the courts, this is satisfied where a Plaintiff plausibly alleges that they suffered direct injuries from the violation, their injury was inextricably intertwined with the violation, or the Defendants intended to injure them by such violation. *See Assoc. of Gen'l Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-45 (1983); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982); *Aspen Skiing*, 472 U.S. at 603 ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." (quotation omitted)). As explained above, Plaintiffs have alleged violations under Sherman Act §§ 1, 2, and 13(a). Because these violations resulted in the manipulation of market prices, improper exclusion of competitors, supracompetitive fees paid by the Class and monopolization of the relevant market for exchange services, Plaintiffs' allegations satisfy all three tests for antitrust injury. SAC ¶¶9,13, 44-46, 66.

Even a cursory reading of the complaint shows that Plaintiffs' alleged antitrust injury

"flows from that which makes defendants' acts unlawful." *Atlantic Richfield*, 495 U.S. 334; *see also Sanner v. Bd. of Trade of the City of Chicago*, 62 F.3d 918 (7th Cir. 1995) ("Essentially, the doctrine of antitrust standing is the equivalent of the common-law tort limitation of proximate cause"). Plaintiffs claim that Defendants' practices have unreasonably restricted competition by excluding access to high speed trading facilities. Such exclusion itself is sufficient to show injury to consumers, and Plaintiffs, though not required, have specifically alleged that they suffered damages from this behavior. *See Aspen Skiing* at 607-08 (consumers injured by not having easy access to all four mountains); *Assoc. of Gen'l Contractors,* 459 U.S. at 528 ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) ("The antitrust laws are concerned with the competitive process*,* and their application does not depend in each particular case upon the ultimate demonstrable consumer effect.") Defendants' proposed authority is easily distinguishable from the facts at issue here.[25]

### C. PLAINTIFFS COMMON LAW CLAIMS ARE SUSTAINABLY PLED

### 1. Plaintiffs Adequately Pled A Cause Of Action Against Defendants For Fraud.

---

[25] Three cases involve an alleged scheme **to defraud**: *Bunker Ramo Corp. v United Bus. Forms, Inc.*, 713 F.2d 1272, 1275 (7th Cir. 1983) (Defendants allegedly falsified "purchase orders, invoices, and delivery receipts for business forms that were never delivered but were paid for by [plaintiffs]"; *Carl Sandburg Vil. Condominium Ass'n No. 1 v First Condominium Dev. Co.*, 586 F. Supp. 155, 162 (N.D. Ill. 1983), *affd,* 758 F.2d 203 (7th Cir. 1985) ("Plaintiffs' allegations disclose a scheme to sell condominium units at an inflated price by engaging a management company which would conceal substantial flaws in the condominium buildings); *Thomas v. Urban P'ship Bank*, No. 12 C 6257, 2013 WL 1788522, at *13 (N.D. Ill. Apr. 26, 2013) (Plaintiff "does not defend her view that a conspiracy to commit fraud among two participants in a market is a 'conspiracy in restraint of trade' within the meaning of the Sherman Act, or that increased loan prices that result from a borrower's lower credit rating that result in turn from such fraud constitute 'antitrust injury'").

Defendants assert that "Plaintiffs do not plead any of the six [sic] required elements under Illinois law with the particularity required by Rule 9(b)." Def. Br. at p. 21.[26] Defendants are wrong.  In *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 524 ((7th Cir. 1993) Judge Posner stated that "All Rule 9(b) required, however, was that [the plaintiff] set forth the date and content of the statements or omissions that it claimed to be fraudulent." (citations omitted). Here, Defendants treat pleading fraud as a mechanical, rote process. But, in cases such as this one, particularity only requires "who, what, when, where, and how of the fraud with sufficient specificity so that a response to the complaint can be formulated …" *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 616 (7th Cir. 2011).

The "who" are the Defendants. SAC ¶¶ 2,17. The "what" is Defendants' clandestine support for preferred HFT participants at the expense of other market participants when Defendants had a duty to treat all commodities brokers equally. SAC ¶11, 47, 78, 83, 115, 140. The "when" is the class period of January 1, 2005 and April 10, 2014. SAC ¶2. The "where" are the various exchanges controlled by Defendants. ¶17(a).  The "how" is the advantage of the Latency Loophole and other preferments to the disadvantage of other unsuspecting market participants and the Defendants' acquiescence. ¶¶ 38-69. When a complaint spells out the contours of a complex scheme, it has met the particularity requirements of Rule 9(b).

## 2. **Plaintiffs Have Adequately Pled A Cause Of Action For Unjust Enrichment.**

### a. **Legal Standard for Unjust Enrichment.**

Plaintiffs have alleged the essential elements of an unjust enrichment claim: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit …" *Pro-Pac, Inc.*

---

[26] Citing *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007). (*Tricontinental* only articulates five elements. *See Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 889 (Ill. 2012).

*v. WOW Logistics Co*., 721 F.3d 781, 784-85 (7th Cir. 2013) (citation omitted). A defendant, under an unjust enrichment theory, may be liable even if the defendant has purposefully benefitted another or effectively designated another party to receive a benefit. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004.) Plaintiffs allege Defendants had "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1114 (7th Cir. 1994) (Illinois law).

### b. "Benefit" is Broadly Construed

Defendants assert that "Plaintiffs' conclusory allegations do not support a claim for unjust enrichment under *Twombly* and should be dismissed in their entirety." Def. Br. at 27-28. However, the term 'benefit' is "any form of advantage received, which is capable of having its value measured, and it accordingly includes the advantage of being saved from an expense or loss." *Lawrence Warehouse Co. v. Towhig*, 224 F.2d 493, 498 (8th Cir. 1955) (Illinois law).[27]

In *HPI Health Care Services v. Mt. Vernon Hospital*, 545 N.E. 2d 672, 679 (Ill. 1989), the Court held that the "benefit" plaintiff seeks to recover need not have passed directly to plaintiff from the defendant. The Court set three alternative criteria for a benefit unjustly retained. The second "defendant procured the benefit from the third party through some type of wrongful conduct" (*id*.), is directly applicable here. *See e.g., Siegel v. Stork Craft Manufacturing, Inc.*, 780 F. Supp. 2d 691, 695 (N.D. Ill. 2011).

Defendant's unjust benefits include the increase in CME's transactional revenues resulting from the much higher volume of futures contract transactions by HFTs, who were incentivized to increase trade activity as a result of their manipulative trading practices. SAC ¶¶

---

[27] See discussion *supra* re *Twombly*. Defendant's cite *Kline v. Mortgage Elec. Sec. Sys.*, 2010 WL 1372407, at *6 (S.D. Ohio Feb. 16, 2010) for the proposition that "Conclusory allegations are not actionable." The *Kline* complaint failed to allege that the creditor received any benefit. *Id*.

11-12, 49 n.21, 56-69, 123, 130-32, 147-48. The HFTs' actions were solely possible because of Defendants' willfully refusal to enforce rules and regulations banning manipulation and illegal practices. SAC ¶¶ 36 n.5, 42, 64 n.35, 107, 112. Defendants are co-conspirators who gained a benefit by increasing the volume of commodities trades through excluding competitors from the market for exchange services, thereby increasing volume from favored HFTs for which the Defendants received increased fees. SAC¶¶ 1, 39.  It would be unjust to allow them to retain the benefit of such misconduct. *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 577-78 (7th Cir. 2004).

### c.   Plaintiffs Have Demonstrated the Need for a Constructive Trust.

"Under Illinois law, a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving the benefit to convey the property back to the person from whom it was received." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 630 (7th Cir. 2010). Plaintiffs need only establish "the existence of identifiable property to serve as the res upon which a trust can be imposed …" *People ex rel. Hartigan v. Candy Club*, 501 N.E.2d 188, 191 (Ill. 1986). A constructive trust suit "is maintainable in all cases where a person has received money or property which, in equity and good conscience, he ought not be allowed to retain, *regardless of whether a fiduciary relationship exists between him and the aggrieved party*." *People ex rel. Daley for Use of Cook County v. Warren Motors, Inc*., 483 N.E.2d 427, 431 (Ill. App. 1st Dist. 1985) (emphasis in the original). Here, Plaintiffs have adequately set forth the *res* for which a trust should be imposed. SAC ¶¶ 126, 136, 145, 152, 154. The amount of money attained by the Defendants is exclusively within their control; and, through discovery, Plaintiffs will be able to calculate the exact amount.

### D.  PLAINTIFFS ADEQUATELY PLEAD FRAUDULENT CONCEALMENT WHICH TOLLS THE STATUTE OF LIMITATIONS

1. **Plaintiffs Plead Sufficient Particularity To Toll The Statute Of Limitations**.

Generally, affirmative defenses such as statutes of limitations are not resolved on a motion to dismiss. *Hollander v. Brown*, 457 F.3d 688, 691, n.1 (7th Cir. 2006). However, if the Court entertains Defendants' argument, Plaintiffs aver that they amply pled fraudulent concealment. SAC ¶¶ 78-88. The Complaint demonstrates that Defendants had an affirmative duty to inform the public that they allowed trading advantages for HFTs. ¶¶ 1, 39 57, 64-69, 74, 79-80, 115-16. The HFTs attained large profits from these advantages.  These facts were withheld by Defendants who had a duty to reveal but did not for their personal gain. ¶¶ 78-81.

Here, Plaintiffs adequately pled that Defendant Duffy acted on behalf of the other defendants to withhold information and falsely tout the operation of HFTs. SAC ¶ 84. Plaintiffs adequately alleged the "misrepresentations" of concealed information, ¶¶ 70-77, the "substance of the concealed materials," ¶¶12, 40, 44, 78-88), "when and where … conduct occurred," ¶¶ 85-86; "duty to disclose," ¶¶ 80, 107, 115; and "due diligence." ¶¶ 41, 84. Such claims are comparable to those deemed adequate by courts in similar actions. *See, e.g., In re TFT-LCD (Flat Panel) Antirust Litig*., 586 F. Supp. 2d 1109, 1132 (N.D. Cal. 2008).

Defendants ask the Court to infer that Plaintiffs could have learned of this well-concealed conspiracy "with the exercise of reasonable diligence." Def. Br. at 30.  The law requires that Defendants show that Plaintiffs had reason to know that their representations were false – meaning, in this context, that Plaintiffs knew their injuries came from illegal conduct and not from legitimate actions as suggested by Defendants. *See In re Copper Antitrust Litig*., 436 F.3d 782, 791-92 (7th Cir. 2006).  The Defendants fail to reveal any statements which indicate that the public was ever informed of the illegal advantages created for the benefit of the HFTs.

2. **Defendants Seek to Apply an Inappropriate Heightened Pleading Standard**.

Defendants claim that Plaintiffs were required to plead "what information [the Wall Street Journal] possessed that Plaintiffs could not have obtained with the exercise of reasonable diligence." Def. Br. at 30. Defendants do not cite a single court holding Plaintiffs to a heightened pleading standard based on the unique, in-depth sources of a renowned reporter. Such standard is inconsistent with the Seventh Circuit's analysis in *In re Copper*, 436 F.3d at 792. Here, Plaintiffs have alleged specific details supporting their fraudulent concealment claim: misrepresentations of concealed information, SAC ¶¶ 70-77; when and where the concealment took place, ¶¶ 85-86; and when Plaintiffs discovered the fraud. ¶¶ 12, 40, 44, 78-88.

### 3. **Defendants Are Equitably Estopped From Asserting the Statute of Limitations.**

Defendants' actions and omissions falsely depicted the true facts and caused Plaintiffs' injuries; and Defendants are estopped from claiming running of the statute of limitations. *See, e.g., Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991). For purposes of the statute of limitation, fraudulent concealment by one defendant is imputed to all the members of the conspiracy and thus tolls the statute as to all defendants. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 447-48 & n.8 (6th Cir. 2012). Here, Plaintiffs' allegations of fraudulent concealment establish a legally cognizable basis for extending back the Class Period.

### CONCLUSION

For all the reasons set forth above, Defendants' motion to dismiss the Amended Complaint should be denied in its entirety.[28]

---

[28] To any extent that any portion of any claim is found to be lacking in any respect, Plaintiffs should be granted leave to replead same based on the extensive and on-going new revelations about Defendants' conduct, the widespread resulting unlawful wash sales, and the other anticompetitive and unlawful effects of Defendants' conduct on Defendants' exchanges on which Plaintiffs and Class members transacted. *See* Fed.R.Civ.P. 15(a)(2); *Fuhrer v. Fuhrer*, 292 F.2d 140, 142 (7th Cir. 1961).

Dated:  Chicago, Illinois
            October 30, 2014

**LAW OFFICES OF R. TAMARA DE SILVA**
Respectfully submitted
By: **/s/ R. Tamara de Silva**
R. Tamara de Silva
(Attorney #6244445)
650 N. Dearborn St., Suite 700
Chicago, Illinois 60654
rtamaradesilva@uchicago.edu
(312) 913-9999

**LOVELL STEWART HALEBIAN JACOBSON LLP**
Christopher Lovell
clovell@lshllp.com
Victor E. Stewart
victornj@ix.netcom.com
Robert W. Rodriguez
rbrodr@aol.com
Christopher Mooney
cmooney@lshllp.com
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900