UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM C. BRAMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 14 C 2646 |
| | ) | |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| THE CME GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs, a putative class of public investors who purchased and/or sold futures contracts listed on the Chicago Board of Trade ("CBOT") and the Chicago Mercantile Exchange ("CME") and/or used real-time futures market data purchased from the CBOT, the CME and/or the CME Group, Inc. (collectively, the "Exchange Defendants") between January 1, 2005 and April 10, 2014, have sued the Exchange Defendants and certain individual defendants alleging violation of the Commodity Exchange Act and federal antitrust laws, as well as claims of fraud and unjust enrichment.

The case is before the Court on defendants' motion to dismiss plaintiffs' Second Amended Complaint [45]. For the reasons explained below, the motion is granted.

## Factual Background

On May 26, 2015, this Court denied plaintiffs' motion to file a third amended complaint [86, 87]. As a result, the Second Amended Complaint is the operative

complaint. It alleges that the Chicago derivatives markets "have engaged in agreements with certain high frequency trading firms to erode the integrity of the marketplace and manipulate prices." Second Amended Complaint [25], ¶1. Plaintiffs allege that the exchanges,

> together with a sophisticated class of technology-driven entities known commonly as "high frequency traders". . . have provided and utilized information asymmetry along with clandestine incentive agreements and illegal trading practices to create a two-tiered marketplace that disadvantages the American public and all other futures marketplace participants, all the while continuing to represent to the public and their regulators that they continue to provide transparent and fair trading markets to the global market.

*Id.* Additionally, plaintiffs allege, "the advantages given to HFTs by the Exchange Defendants effectively create a 'zero sum' trading scenario where the HFTs gain what the Class Members lose by effectively providing HFTs with the opportunity to skim an improper profit on every futures transaction." *Id.*

The named plaintiffs, William Charles Braman, Mark Mendelson and John Simms, bring suit on behalf of themselves and a putative class of public investors who purchased and/or sold futures contracts in the United States that are listed on the CBOT and the CME and/or used real-time futures market data purchased from the Exchange Defendants. *Id.*, ¶2. The defendants include: (1) the Exchange Defendants – the CBOT and CME, which are "contract markets registered with the Commodity Futures Trading Commission," and CME Group, Inc., which "owns and operates derivatives exchanges, including the CME and the CBOT, *id.*, ¶¶3, 17(a)); and (2) certain individuals – Terrence A. Duffy, who "has served as Executive Chairman and President of CME Group since 2012" and previously served as

Executive Chairman since 2006; Phupinder Gill, who "has served as the Chief Executive Officer of the CME Group since 2012" and previously served as president of CME Group and President and Chief Operating Officer of CME Holdings and of the CME; Bryan T. Durkin, who "has served as Chief Operating Officer of the CME Group since July 2007"; and Anita Liskey, who "has served as Managing Director [of] Corporate Marketing and Communications of the CME Group since 2007, and Managing Director [of] Corporate Marketing and Communications of the CME since 2002." *Id.*, ¶17(c)-(f).

Plaintiffs' Second Amended Complaint alleges manipulation in violation of the Commodity Exchange Act, 7 U.S.C. § 9 and CFTC Rule 180.1 (first cause of action); false information in violation of the Commodity Exchange Act, 7 U.S.C. § 9 (second cause of action); violation of the Commodity Exchange Act, 7 U.S.C. §§ 25(b)(1) and (2)(third cause of action); aiding and abetting manipulation in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (fourth cause of action); fraud (fifth cause of action); violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.,* based upon transaction prices (sixth cause of action); violation of Section 1 of the Sherman Act based upon commissions and other costs of trading (seventh cause of action); violations of the Sherman Act Sections 1 and 13(a), 15 U.S.C. §§ 1, 13(a), regarding rebates (eighth cause of action); violation of Section 2 of the Sherman Act based upon defendants' monopoly, attempt to monopolize, conspiracy to monopolize (ninth cause of action); and unjust enrichment (tenth

cause of action).  Each claim is asserted against all defendants and, for each claim, the relevant time period is January 1, 2005 to April 10, 2014.

The plaintiffs allege that, sometime "after January 1, 2005, the Exchange Defendants began to allow certain HFTs to use an exploitable structural advantage known only to Defendants that existed at the CME called the Latency Loophole, which advantage, when coupled with receiving price information faster than all the Exchange Defendants' other customers, would allow these select firms to exploit the order flow of all the other customers and users of the Exchange Defendants' trading markets."  Second Amended Complaint [25], ¶4.  According to plaintiffs, the latency loophole, or latency gap, is the "gap in time between when a HFT with [direct market access] can see that it made a trade and at what price" and "when the rest of the world is made aware of this trade."  *Id.*, ¶10 n.2.

Plaintiffs allege that the defendants failed to "apprise the Class members of this improper preferential trading advantage."  *Id.*  Plaintiffs further allege that, sometime "after the commencement of the Class Period, the Exchange Defendants began to allow HFTs to enter and/or execute orders to buy and sell futures contracts based upon the non-public price information belonging to all non-HTFs.  The Exchange Defendants allowed the HFTs an exclusive position by which to profit from peeking at everyone else's orders and price data and to act on this price and order information."  *Id.*, ¶5.  They allege that "the Exchange Defendants provided the HFTs with reduced or waived commissions, while allowing the HFTs to [use the

Latency Loophole, direct market access and wash trades,[1] to engage in spoofing[2] activities and to enter orders without a clearing stop or risk check]." *Id.* The gravamen of plaintiffs' claim is that the Exchange Defendants solicited and accepted the plaintiffs' subscription fees for "real-time" service, but failed to reveal any of the preferential arrangements they made with the HFTs that resulted in, effectively, a two-tiered structure wherein the HFTs received information faster, making the information available to Class Members stale and making Class Members' order information and trading activities "fodder for the Exchange Defendants' preferred market participants to exploit." *Id.*, ¶6.

Along similar lines, the plaintiffs allege that the Exchange Defendants have given the HFTs certain advantages and concealed those advantages from the rest of the trading world and the public. *Id.*, ¶12. Plaintiffs allege that the defendants offer "clandestine incentive agreements" (market maker programs); the terms of the agreements "including their existence in certain markets, are fiercely shrouded in secrecy and not accessible to the Plaintiff Class." *Id.*, ¶57. These allegations are based on statements from confidential witnesses A and B. *Id.*, ¶¶51, 59. Plaintiffs allege that:

> Defendants have permitted preferred HFTs to use structural advantages, whether hidden and not, to execute trades ahead of

---

[1] Wash trades or wash sales "occur when the same party takes both sides of a trading transaction - in other words, the same party is both the buyer and the seller." Second Amended Complaint [25], n.4. "Wash trades are banned under United States law because they can be used to manipulate prices, falsely give the impression of both volume and price movement." *Id.* Wash trades are "prohibited by the CEA §4c(a)(1) and (2)." *Id.*

[2] Spoofing is "the practice of canceling large amounts of orders which orders can create the impression of liquidity and market activity." Second Amended Complaint [25], n.4. Spoofing is "banned by CEA §4c(a)(5)(C), §4c(a)(2)(B) and §9(a)(2)." *Id.*

everyone else by using the order information of all Defendants' other customers, thereby causing Class Members economic losses by such exploitation. This conduct by the Exchange Defendants is in direct violation of the CEA and the CFTC's Rule and Regulations, and has resulted in exchange-created, institutionalized fraudulent devices that encourage market manipulation and an opaque and hidden marketplace for financial futures. In allowing HFTs to use such improperly obtained order information, Defendants have sanctioned the practice of selectively allowing trading on non-public information in micro and milliseconds.

Second Amended Complaint [25], ¶68.

The above allegations are just illustrative examples; plaintiffs' Second Amended Complaint runs 58 pages and includes 158 paragraphs. The complaint includes 88 introductory paragraphs before asserting a cause of action and then, for each cause of action, incorporates by reference all preceding allegations. As a practical matter, this pleading style requires the Court to discern which allegations relate specifically to which claim(s). The Court will endeavor to detail the relevant allegations that form the basis of each claim below, as it addresses the sufficiency of plaintiffs' claims and the defendants' arguments concerning each.

<u>Discussion</u>

I.   <u>Applicable Legal Standards</u>

Defendants moved to dismiss the Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), this Court must construe the Second Amended Complaint in the light most favorable to the plaintiffs, accept as true all well-pleaded facts and draw reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of

law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915. Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive defendants' motion under Rule 12(b)(6), the Second Amended Complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)).

## II. Statute of Limitations Issues

The Court first considers defendants' argument that plaintiffs' claims may be time-barred. Plaintiffs have alleged ten claims, and several different statutes of limitations are at issue. Private actions under the Commodity Exchange Act ("CEA) are subject to a two-year statute of limitations. 7 U.S.C. § 25(c); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2013 WL 212908, at *7 (N.D. Ill. Jan. 18, 2013)(citing *Indemnified Capital Invs., SA v. R.J. O'Brien &*

*Assocs., Inc.*, 12 F.3d 1406, 1411 (7th Cir. 1993)). This statute of limitations governs plaintiffs' first, second, third and fourth causes of action.

The Clayton Act subjects plaintiffs' federal antitrust claims to a four-year statute of limitations, 15 U.S.C. § 15b, which begins to run "when a defendant commits an act that injures a plaintiff's business." *In re Dairy Farmers*, 2013 WL 212908, at *7 (citing *Rotella v. Wood*, 528 U.S. 549, 558 (2000)). This statute of limitations would apply to plaintiffs' sixth, seventh, eighth and ninth causes of action.

The statute of limitations for plaintiffs' fraud and unjust enrichment claims claim (fifth and tenth causes of action) is five years. 735 ILCS 5/13-205.

Given that the time period alleged in the complaint begins in 2005, timeliness would, at first blush, seem to be a real concern. The initial complaint was filed on April 11, 2014. However, all of the limitations periods discussed above are subject to the discovery rule – that is, none begins to run until the plaintiffs know or reasonably should know that they have been injured and that their injuries were wrongfully caused. *E.g., Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991)(discovery rule applies in claims for violation of the CEA); *In re Dairy Farmers*, 2013 WL 212908, at *7 (discovery rule applies in claims for violation of antitrust laws); *Horbach v. Kaczmarek*, 934 F.Supp. 981, 985 (N.D. Ill. 1996)(discovery rule applies to Illinois' five-year statute of limitations).

Plaintiffs' allegations can fairly be read to say that they first learned they had been injured and that their injuries were wrongfully caused on May 1, 2013,

when an article appeared in the Wall Street Journal publicly disclosing the existence of the Latency Loophole. According to plaintiffs, the Latency Loophole gave HFTs an informational advantage and allowed the HFTs to exploit plaintiffs and cause them to suffer losses. Second Amended Complaint [25], ¶10. Prior to May 1, 2013, plaintiffs allege, the existence of the Latency Loophole was "known only to selected market participants/insiders and the CME." *Id.* Because plaintiffs filed their initial complaint less than a year after the alleged public disclosure of the Latency Loophole, the Court cannot say at this stage of the proceedings that the plaintiffs' claims are time-barred and will not dismiss on this basis.

III.   Analysis of Plaintiffs' Claims

A.   Plaintiffs' Claims Under the Commodity Exchange Act

For their claims under the Commodity Exchange Act ("CEA"), plaintiffs allege that defendants violated §§ 9, 25(b)(1) and (2) of the CEA and CFTC Rule 180.1, and that they aided and abetted manipulation in violation of the Act. For their first cause of action, plaintiffs allege that the defendants violated § 9 and CFTC Rule 180.1 when they "created a marketplace fraught with manipulation and clandestine, surreptitious trading that caused the prices of futures contracts to be artificial" and that defendants "perpetrated a fraud on the marketplace and intentionally concealed the activities of a select class of market participants from the rest of Defendants' customers and marketplace users while artificially altering the published price of futures and interest rate contracts at the CME and CBOT." Second Amended Complaint [25], ¶¶92-93.

For their second cause of action, plaintiffs allege that defendants provided false information in violation of §9. Specifically, plaintiffs allege that defendants made representations about data and price information and "continuously misled Plaintiffs and the Class in connection with the purchase and/or sale of futures contracts and defrauded and attempted to defraud Plaintiffs and the Class." Second Amended Complaint [25], ¶¶99, 101. Plaintiffs allege that "[d]efendants' actions alleged herein (they do not reference any particular actions here) not only constitute a failure to ensure markets free of manipulation, they constitute active market manipulation and falsification of the price of the CME and CBOT's financial and other futures contracts, and/or the price of the government debt and other commodities underlying these contracts." *Id.*, ¶100.

For their third cause of action, plaintiffs allege that "[d]efendants' conduct as alleged herein violated their obligations to enforce rules relating to market and financial integrity and stability" and that their "continuous refusal and unwillingness during the Class Period to enforce CEA and CFTC Rules and Regulations against all forms of manipulative conduct, and in particular preferential order placement, electronic front-running, rebate arbitrage, slow-market arbitrage, wash sales, spamming, spoofing, and/or quote spamming on the Exchange Defendants' exchanges, and Defendants' continued misstatement and omissions of material facts regarding the preferred arrangements that Defendants promoted and created with HFTs, for the financial benefit of the Defendant Exchanges and to the financial detriment of Plaintiffs and the Class, clearly

demonstrate that Defendants acted in bad faith."  Second Amended Complaint [25], ¶107.

Defendants first argue that the plaintiffs fail adequately to allege the elements of a private right of action under the CEA.  As an initial matter, although many of the activities alleged in plaintiffs' complaint violate the CEA – spoofing, wash trading, etc. – the CEA does not create a private right of action for such violations, and plaintiffs are not suing for such behavior.  Rather, plaintiffs are suing to hold the defendants liable for creating the circumstances in which such activity flourished.

Section 22 of the CEA[3] provides a private right of action against a person who violates the CEA, but only in certain limited circumstances.  *See* 7 U.S.C. §25. Section 22 "expresses Congress's intent to limit the 'circumstances under which a civil litigant could assert a private right of action for a violation of the CEA or CFTC regulations.'"  *In re MF Global Holdings Ltd. Inc. Litigation*, 998 F.Supp.2d 157, 175-176 (S.D.N.Y. 2014)(quoting *Klein & Co. Futures, Inc. v. Board of Trade of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006); H.R. Rep. No. 97–565, pt. 1, at 57 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3906)).  Section 22 "thus 'lays out what are in essence conditions precedent' to a private cause of action."  *In re MF Global Holdings*, 998 F.Supp.2d at 176 (quoting *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1042 (S.D.N.Y. 1993)).  To survive a motion to dismiss a claim for direct

---

[3] Decisions and authorities discussing the private right of action created under the Commodity Exchange Act often refer to "Section 22" even when citing to "Section 25."  Section 22 is the section number assigned in the actual text of the CEA itself, whereas Section 25 is the number designated to that section within the United States Code.  For the purposes of this opinion, the Court uses the conventional reference to "Section 22" when discussing the United States Code cite (i.e., §25).

violations of the CEA, a private plaintiff "must plead facts to show both that the defendant violated the CEA and that the defendant 'stand[s] in an appropriate relationship to the plaintiff with respect to' the alleged CEA violation." *In re MF Global Holdings*, 998 F.Supp.2d at 176 (quoting *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 186 (3d Cir. 2000)).

Section 22 spells out four circumstances where a private right of action will lie, each is "explicitly transactional in nature: receiving trading advice for a fee, making a contract of sale of any commodity for future delivery or the payment of money to make such a contract, placing an order for purchase or sale of a commodity, or market manipulation in connection with a contract for sale of a commodity." *Loginovskaya v. Batratchenki*, 764 F.3d 266, 270 (2d Cir. 2014); 7 U.S.C. §25(a)(1). The statute "creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market." *Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 856-57 (N.D. Ill. 2010); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1153 (7th Cir. 1992) (emphasis added; abrogated on other grounds)).

Section 22 provides:

> [a]ny person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –

> (A) who received trading advice from such person for a fee;

12

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of –

> (i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);

> (ii) a contract subject to section 23 of this title; or

> (iii) an interest or participation in a commodity pool; or

> (iv) a swap; or

(D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes–

> (i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or

> (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.

7 U.S.C. §25(a)(1).

Subsection (b) of Section 22 provides additional remedies for persons injured by violations of subsection (a), but subsection (b) does not expand the scope of the private rights of action afforded under the CEA. Subsection (b) provides as follows:

(1)(A) A registered entity that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7, 7a-

1, 7a-2, 7b-3, or 24a of this title, (B) a licensed board of trade that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by the Commission, or (C) any registered entity that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order, shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such registered entity to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions.

(2) A registered futures association that fails to enforce any bylaw or rule that is required under section 21 of this title or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person that engaged in any transaction specified in subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

(3) Any individual who, in the capacity as an officer, director, governor, committee member, or employee of registered entity or a registered futures association willfully aids, abets, counsels, induces, or procures any failure by any such entity to enforce (or any violation of the chapter in enforcing) any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, shall be liable for actual damages sustained by a person who engaged in any transaction specified in subsection (a) of this section on, or subject to the rules of, such registered entity or, in the case of an officer, director, governor, committee member, or employee of a registered futures association, any transaction specified in subsection (a) of this section, in either case to the extent of such person's actual losses that resulted from such transaction and were caused by such failure or violation.

7 U.S.C. §25(b)(1)-(3). "A person seeking to enforce liability under this section must establish that the registered entity, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss." *Id.*, §25(b)(4).

1. <u>False Information</u>

Turning first to plaintiffs' false information claim (plaintiffs' second cause of action), defendants argue that plaintiffs cannot pursue a private right of action for false information. The Court agrees. Section 22(a), which, as explained above provides the only circumstances in which a private right of action exists, does not cover such a claim. Section 9 of the CEA makes it "unlawful for any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading." 7 U.S.C.A. § 9(2). By its terms, this section covers statements made "to the Commission" – the complaint here, however, makes no allegations about statements made to the Commission.

Although this fact would seem to be dispositive, *In re Soybean Futures Litigation*, 892 F.Supp. 1025 (N.D. Ill. 1995) suggests that the Court must take its analysis one step farther and determine whether the alleged false information contributed to the alleged manipulation. In that case, the court recognized that the CEA did not authorize a private right of action for false information, but declined to reject outright the plaintiff's false information claim because it could fairly be read

to allege that the false reports played a part in defendants' alleged manipulation scheme. 892 F.Supp. at 1046. The information at issue in that case was provided to the Commission in the form of market reports, whereas here there is no allegation about false information being provided to the Commission in the form or market reports or otherwise. But, to the extent plaintiffs here are similarly alleging that the false information contributed to the manipulation, the issue will be addressed below. In all other respects, the plaintiffs' false information claim fails.

The Court turns next to what clearly are permissible private causes of action: manipulation and aiding and abetting manipulation.

### 2. Manipulation

For their first cause of action, plaintiffs allege manipulation.[4] To prevail on a claim of manipulation, plaintiffs must prove that: (1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants specifically intended to cause the artificial price. *E.g.*, *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 801 F.3d 758, 764-65 (2015)(citing *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1177–78 (7th Cir. 1991); *In re Soybean Futures Litig.*, 892 F.Supp. 1025, 1045 (N.D. Ill. 1995)). At a minimum, plaintiffs' allegations fail to show the last three elements.

---

[4] Although the plaintiffs tend in their complaint to lump all of the defendants together, plaintiffs concede that "CME Group Inc. does not technically meet the exact description of any of those categories" for which the CEA creates a private right of action. *See* Response, pp. 20-21. Plaintiffs' CEA claims against CME Group Inc. fail for this reason as well as for the reasons explained in this section.

For starters, plaintiffs have not alleged sufficient facts to support an inference that an artificial price existed. "To determine whether an artificial price existed, courts look to whether the price is affected by a factor that is not a 'legitimate part of the economic pricing of the commodity.'" *In re Rough Rice Commodity Litigation*, No. 11 C 618, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012)(quoting *In re Indiana Farm Bureau*, CFTC No. 75-14, 1982 WL 30249, *35 n. 2 (C.F.T.C. Dec. 17, 1982)). In *In re Rough Rice Commodity Litigation*, 2012 WL 473091, at *6, the court determined that misconduct alone was not enough to prove price artificiality. That is all plaintiffs allege here (and they do not even allege misconduct on the part of the named defendants; rather, they allege misconduct on behalf of the HFTs). The *In re Rough Rice* plaintiffs actually alleged the existence of price fluctuations that were unusual for the rough rice contracts. *Id.* That was not enough. Plaintiffs here have not done even that much.

Nor have plaintiffs alleged that the defendants caused an artificial price. Assuming some artificial price did exist, the allegations indicate that it would have been caused by the HFTs, not by the Exchange Defendants. Indeed, had the HFTs not traded, there would have been no fluctuation in price because of anything the defendants did or did not do. *In re Barclays Liquidity Cross and High Frequency Trading Litigation*, a recent case out of the Southern District of New York, is instructive on this point.

In *In re Barclays Liquidity Cross and High Frequency Trading Litigation*, 14-MD-2589 (JMF), 2015 WL 5052538 (S.D.N.Y. Aug. 26, 2015), the plaintiff investors

claimed that the defendant stock exchanges violated the Securities Exchange Act of 1934 by engaging in a manipulative scheme in which they enabled HFT firms to exploit ordinary investors trading on the Exchanges in return for the HFTs' considerable trading business. The plaintiffs, like the plaintiffs here, alleged that the exchange defendants, like the exchange defendants here, catered to HFTs, allowing them to amass a significant speed advantage over ordinary investors and to employ trading strategies that exploited that speed advantage to the detriment of ordinary investors, and then failed to disclose the special treatment afforded those traders. In dismissing the plaintiffs' claims, the court found that plaintiff had failed to allege any manipulative acts on the part of the Exchanges. *In re Barclays*, 2015 WL 5052538, at *14. A "manipulative act" is "any act – as opposed to a statement – that has such an 'artificial[]' effect on the price of a security." *Id.* And to "the extent that the SDNY Plaintiffs allege an artificial effect on the market, that effect was caused by the HFT firms' trades themselves, not by the Exchanges' provision of co-location services, proprietary data feeds, and complex order types to the HFT firms. Put simply, without the trades, there would be no effect on the market at all." *Id.,* at *15. The same is true here: even if, as plaintiffs allege, the defendants created this two-tiered marketplace, the existence of the marketplace itself is not alleged to have caused price fluctuations, artificiality or losses. It is the HFTs' trades that cause any manipulation of prices, any artificiality and any losses. As such, plaintiffs have failed to allege that defendants caused any artificial price.

Nor have plaintiffs plausibly alleged that Defendants intended to cause artificial prices. A "manipulation claim requires a showing of specific intent, that is, a showing that 'the accused acted (or failed to act) with the purpose or conscious object' of influencing prices." *Soybean Futures*, 892 F.Supp. at 1058-59 (quoting *Indiana Farm*, 1982 WL 30249, at *7). "Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA." *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *7 (citing *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) (affirming dismissal and holding that under a "specific intent standard, mere knowledge is not enough. Defendants must have specifically intended to impact the futures market"). Plaintiffs have not alleged that the defendants intended to cause artificial prices, or even that they intended to cause the HFTs to behave in ways that would artificially affect prices. They allege only that defendants intended to cause – indeed, incentivized and encouraged – HFTs to transact business on the exchanges. Because high frequency trading itself does not violate the CEA, these allegations are not enough to establish any specific intent on the part of the defendants.

Defendants argue that plaintiffs' allegations, at their core, claim "that *every* contract in *every* market traded on the CME and CBOT Exchanges [during a Class Period that spans more than nine years] was tainted by the presence of undefined and unidentified HFTs." Reply [71], p. 1. The broad description of the plaintiffs' allegations is accurate. Plaintiffs argue that they were harmed because of the

actions of HFTs, as encouraged and incentivized by the defendants. Plaintiffs reference only one HFT (Virtu) in their pleadings (not in the Second Amended Complaint, but in their opposition brief). Yet they do not allege that any of them actually suffered damages as a result of anything Virtu did or failed to do – indeed, they do not allege that they traded any of the same commodities or contracts Virtu traded. Such defective allegations (found throughout the Second Amended Complaint) are not enough to defeat a well-taken motion to dismiss. Rather, the plaintiffs' purported claims each have specific elements that must be pled – not in a conclusory manner, but with enough factual content to allow the Court to draw the reasonable inference that the defendants are liable for the misconduct alleged. The requisite factual content, however, is lacking here.

### 3. Aiding & Abetting

For their fourth cause of action, plaintiffs allege "aiding and abetting" manipulation in violation of the CEA. They allege that defendants "knowingly aided and abetted the [alleged] violations of the CEA" and that each defendant "counseled, induced and/or procured the [alleged] violations by the other Defendants and the preferred HFT firms." [25], ¶110. To state a claim for aiding and abetting liability under Section 22 (7 U.S.C. §25), plaintiffs must allege that defendants: (1) had knowledge of the HFTs' intent to violate the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of that objective. *Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998)(citing *United States v. Petty*, 132 F.3d 373, 377 (7th Cir. 1997); *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987)).

To prevail on an aiding and abetting claim, plaintiffs must first prove the components of a manipulation claim against a principal. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 765 (7th Cir. 2015).

In *Damato*, the Seventh Circuit considered for the first time, "the extent to which . . . the CEA provides a private right of action against entities that aid and abet a violation of the CEA." 153 F.3d at 468. More precisely, the *Damato* Court considered "whether a plaintiff may bring a private cause of action" under Section 22 of the CEA against persons "who aid and abet a violation of the CEA, even if such aiders and abettors do not satisfy independently the requirements of subsections (A) through (D) of that statute." *Id*. The Court determined that the plain language of the statute shows that an aider and abettor of the primary violator can be held liable in a private action for damages when the "violation" for which the suit is brought is both causally and transactionally connected to the actual damages suffered by the putative plaintiff. *Damato,* 153 F.3d at 470. An aider and abettor sued under the statute need not independently satisfy the requirements of subsections (A) through (D); rather, "an aider and abettor may be held liable under that section so long as the primary violator participates in one of the transactions listed in subsections (A) through (D)." *Id*. Moreover, a plaintiff need not show that his damages were caused by the person charged under the statute, but only that the damages were "caused by such violation" *Id*. "Thus, if the primary violator's wrongdoing satisfies the requirements of subsections (A) through (D), then the plaintiff's damages are 'caused by such violation,' regardless of

whether the aider and abettor independently would satisfy the requirements of those subsections." *Id.*

Here, plaintiffs have alleged that the HFTs manipulated the prices of contracts using predatory trading strategies. That would make the HFTs the primary violators and the defendants the aiders and abettors. But the HFTs do not satisfy the requirements of subsections (A), (B), (C) or (D). As such, this case is not *Damato*. Instead plaintiffs seek to hold liable defendants (who arguably do fall within the enumerated transactions) for aiding and abetting alleged violations committed by people who do not fall within the enumerated circumstances. The statute was not intended to apply in such circumstances, and plaintiffs have cited no case to the contrary.

Moreover, a plaintiff "seeking to state a cause of action for aiding and abetting liability under . . . the CEA must allege that the aider and abettor acted knowingly." *Damato*, 153 F.3d 464, 472 (7th Cir. 1998). Plaintiffs here fail to allege that the defendants had knowledge of any violation on the part of the HFTs. They allege that the defendants offered discounted fees and rates to the HFTs, and they allege that the HFTs engaged in wash sales, spoofing, spamming and other predatory strategies. But they do not allege that the defendants knew that any HFT was violating the CEA. Plaintiffs' attempt to link the "clandestine agreements" to knowledge of violations falls short: those agreements, according to plaintiffs' own allegations, merely encouraged and incentivized high frequency trading, not violations of the CEA. Plaintiffs have not alleged that any particular

HFTs violated the CEA or that the defendants knew about any particular violation of the Act. Indeed, the plaintiffs do not allege any specific violation of the CEA by any specific HFTs.

Plaintiffs' allegations might state a claim for aiding and abetting manipulation if high frequency trading violated the CEA, but it does not. Accordingly, merely alleging that defendants knowingly encouraged and incentivized HFTs to transact business on their exchanges does not state a claim for relief under the CEA. More must be alleged concerning specific violations by specific HFTs. Plaintiffs' allegations are not sufficient to allow the Court to draw a reasonable inference concerning any violation of the CEA or any knowledge on the part of the defendants.

Plaintiffs argue in their response brief that they are suing under Subsection (b) of Section 22 (7 U.S.C. § 25(b)). To the extent any private right of action might exist under that subsection, it is clear that plaintiffs would have to allege and prove bad faith to prevail on such a claim. "The express private right to sue an exchange for failing to enforce rules that it is required to enforce is limited to situations where the exchange's failure is in 'bad faith.'" *Bosco v. Serhant*, 836 F.2d 271, 276 (7th Cir. 1987); 7 U.S.C. § 25(b)(4). "Bad faith" does not mean "actual participation in fraud (or other misconduct)," but does require a showing of something more than mere negligence. *Bosco*, 836 F.2d at 276. Plaintiffs must prove "that the [defendants] knew that a rule [they were] required to enforce was being violated, or—what is in

fact a form of knowledge—deliberately closed [their] eyes so that [they] would not discover what [they] strongly suspected was going on." *Id.*

With respect to bad faith, plaintiffs allege that the defendants' "continuous refusal and unwillingness during the Class Period to enforce CEA and CFTC Rules and Regulations against all forms of manipulative conduct, and in particular preferential order placement, electronic front-running, rebate arbitrage, slow-market arbitrage, wash sales, spamming, spoofing, and/or quote spamming on the Exchange Defendants' exchanges, and Defendants' continued misstatement and omissions of material facts regarding the preferred arrangements that Defendants promoted and created with HFTs, for the financial benefit of the Defendant Exchanges and to the financial detriment of Plaintiffs and the Class, clearly demonstrate that Defendants acted in bad faith." Second Amended Complaint [25], ¶107.

Plaintiffs' allegations attempt to link the alleged preferential treatment of HFTs with the alleged violations. As above, this connection assumes that high frequency trading necessarily violates some rule or regulation that the defendants are required to enforce. Such an allegation is not supported in the law or in the factual record before the Court. High frequency trading is not per se illegal; nor is there any record from which this Court can conclude that all high frequency traders always and necessarily engage in the types of predatory strategies otherwise suggested in the complaint – (spoofing, spamming, wash sales, etc.). Plaintiffs' allegations assume these facts to be true. Plaintiffs have not alleged that any

particular HFTs violated any particular rule or regulation that the defendants were required to enforce or that the defendants knew the HFTs were doing so.

Finally, plaintiffs have failed to allege actual losses on any specific transactions. For plaintiffs to have a private right of action for manipulation or aiding and abetting, they must be able to show that the manipulation caused the plaintiff "'actual damages,' which courts have understood to require a 'net loss[ ].'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013)(citing § 25(a)(1); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010)). With regard to damages, plaintiffs allege that William Braman, Mark Mendelson and John Simms "purchased and/or sold futures contracts at the CBOT and CME during the Class Period and [were] damaged by Defendants' allowance and facilitation of a marketplace manipulated by HFTs and by [their] reliance on what was falsely represented to [them] as real-time market data." Second Amended Complaint [25], ¶16(a), (b), (c). This generic version of a damages allegation is not enough to tie a concrete loss to any manipulation. If it were, every non-HFT trader would be damaged simply by virtue of the fact that HFTs are operating on the exchange.

B.    Plaintiffs' Fraud Claim

For their fifth cause of action, plaintiffs allege fraud. Plaintiffs allege that defendants "entered into clandestine contracts with certain HFTs knowing that the activities of these HFTs would adversely affect all other individuals and entities that utilized the Exchange Defendants' futures contracts." Second Amended

Complaint [25], ¶115. Plaintiffs allege that the defendants knew about the Latency Loophole but failed to disclose it and then, once it was discovered, made deliberately misleading statements about it. Plaintiffs allege that "the CME and CBOT sold price information to the Plaintiffs and the Class as accurate, instant, bona-fide and 'real-time' prices and order information, all the while knowing that they had permitted the HFTs to see and act on this price information before Plaintiffs and the Class could act." *Id.*, ¶117. "Defendants never disclosed this highly material information to Plaintiffs and the Class." *Id.*

Plaintiffs allege that "[Terrence] Duffy and [Anita] Liskey repeatedly made deliberately misleading statements about the Latency Loophole." *Id.*, ¶70. Plaintiffs also allege that defendants fraudulently concealed the fact that they had given certain HFTs a Latency Loophole or clandestine rebate and incentive agreements. *Id.*, ¶78. As to specific statements, the plaintiffs allege that "Defendant Duffy states that all data 'comes from one pipe.'[5] This . . . statement is grossly misleading without the necessary second part of the disclosure so as not to make the first part false and misleading: because transaction fills go to some market participants before the trades make the public data feed, certain HFTs with access do in fact receive valuable price information before the rest of the market and in plenty of time through the use of computer algorithms to transact ahead of the rest of the market." *Id.*, ¶85.

"Under Illinois law, the 'elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false;

---

[5] Given the context, the term "pipe" refers to data feed here.

(3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" *Ohio National Life Assurance Corp. v. Davis*, 13 F. Supp. 3d 876, 882 (N.D. Ill. 2014)(quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996)).   Federal Rule of Civil Procedure 9(b) requires that, when alleging fraud, a plaintiff "must state with particularity the circumstances constituting the fraud . . . ."   A complaint "alleging fraud must provide 'the who, what, when, where, and how.'" *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)(quoting *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 605 (7th Cir. 2005); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Plaintiffs' fraud claim fails for at least two reasons.   First, plaintiffs have not alleged a false statement of material fact.   In fact, although they allege that defendants provided information to HFTs via a faster data feed, plaintiffs concede that Terrence Duffy's "single data feed" or "pipe" statements and representations were "technically true."   Complaint, ¶85.   If plaintiffs cannot show that the statement upon which they relied was false, their claim fails.

Additionally, plaintiffs have not pled fraud with the degree of particularity required by Rule 9(b).   In attempting to allege the "who, what, where, when and how" of the fraud, plaintiffs have painted with such a broad brush that their allegations become imprecise and non-specific.   For example, with regard to the "who," plaintiffs allege that the defendants gave preferential treatment to HFTs

and that HFTs took advantage of their informational advantage to the plaintiffs' detriment over a nine-year window. Alleging the involvement of HFTs generally – an entire class of investors – is not particular, nor have plaintiffs alleged any specifics concerning the actual transactions that allegedly caused them harm.

In response to the defendants' motion to dismiss, plaintiffs submitted exhibits purporting to identify "Recent CME Revelations" and "Further Material Misstatements and Omissions During Class Period." *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Exhibit A [58-1], Exhibit B [58-2]. First, these materials are not helpful for the Court in addressing the motion to dismiss, because they are not referenced in the complaint and are not clearly subject to judicial notice. *E.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Second, and more importantly, the "misstatements" do not help plaintiffs.

Exhibit A identifies "facts" that plaintiffs characterize as "recent CME revelations": (1) "CME has a proprietary trading unit GFX Group, of which Brian Durkin" is the CEO, that "trades against its customers" ("revealed" on August 27, 2014); (2) "the CME also offers an incentive program for central banks" ("revealed" on September 1, 2014); and (3) "the United States Department of Justice indicts HFT for reaping $1.6 in profits from trades made at the CME Groups Inc. through spoofing" ("revealed" on October 2, 2014). Exhibit A [58-1]. The "revelations" noted here, however, are not tied to any false statements made during the Class Period. *See* Exhibit A [58-1].

Nor are the statements identified in Exhibit B helpful. The statements included in Exhibit B appear to be quoted from news articles and internet publications. None of the statements, as plaintiffs concede in their editorial comments, is false on its face, and some of them are more statements of opinion than fact. In one, Terry Duffy is quoted as saying that any regulations the CFTC develops to deal with HFTs should not be too restrictive.

It is hard to imagine how such statements could form the basis of any reliance claim by plaintiffs. Plaintiffs have not alleged with particularity why the excerpted statements are false and misleading, or otherwise constitute a viable fraud theory. Nor have plaintiffs alleged that the defendants' statements induced them to act. Rather, they allege repeatedly that the defendants intended to encourage the HFTs to act.

C. <u>Plaintiffs' Antitrust Claims</u>

Plaintiffs' sixth, seventh, eighth and ninth causes of action all allege violation of the federal antitrust laws. The Sherman Act outlaws every contract, combination, or conspiracy "in restraint of trade," and any monopolization, attempted monopolization, or conspiracy or combination to monopolize. 15 U.S.C. §§1, 2. The Act does not prohibit every restraint of trade, but only those that are unreasonable. The Clayton Act, insofar as is relevant for purposes of this case and as amended by the Robinson-Patman Act of 1936, bans certain discriminatory prices, services, and allowances in dealings between merchants. 15 U.S.C. §13(a). The Clayton Act also authorizes private parties to sue for triple damages when they

have been harmed by conduct that violates either the Sherman Act or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future. 15 U.S.C. §15.

Seeking to invoke these provisions, plaintiffs allege violations of Sections 1 and 2 of the Sherman Act with respect to transaction prices (sixth cause of action) and commissions (seventh cause of action). With respect to transaction prices, plaintiffs allege that defendants have "entered, made, and performed a web of agreements in unreasonable restraint of trade with numerous HFTs and other preferred clients" and allege that defendants' "profit making activities" are "anticompetitive." Second Amended Complaint [25], ¶¶121, 125. With respect to commissions and other costs of trading, plaintiffs allege that defendants' clandestine incentive agreements, offered to HFTs in high volume markets and not offered to plaintiffs, "anti-competitively disadvantaged" plaintiffs and class members "in multiple ways, including the burdens of having to pay higher costs to transact and having to transact in a market in which wash trades or other high volume, manipulative trading practices move prices on an absolute level and periodically disconnected price trends and patterns from market news or other legitimate stimuli." *Id.*, ¶¶130-133.

Plaintiffs also allege that defendants violated §§ 1 and 13(a) of the Sherman Act by offering and making rebate payments to HFTs (eighth cause of action) and violated §2 by attempting and conspiring to monopolize (ninth cause of action). As to the latter, plaintiffs allege that by "diverting monies away from Plaintiffs and the

Class to the HFTs in the performance of Defendants' web of agreements with the HFTs, Defendants have increased the CME Group's power to set prices in these markets, i.e., have increased the CME Group's market power and monopoly power in specific products and generally." *Id.*, ¶149. "Indeed," plaintiffs allege, "Defendants' performance of these agreements and the preferential results provided to the HFTs constitutes a quasi-barrier to entry by competitors and a competitive advantage for Defendants." *Id.*, ¶150. Plaintiffs allege that the CME Group "operates the largest exchange in the United States in commodity futures, commodity options, and other derivatives" and that the "open interest in the CME contracts is the largest of any exchange on earth." Second Amended Complaint [25], ¶147. Plaintiffs also allege that "Defendants' agreements in unreasonable restraint of trade entered into and made with the HFTs have increased CME Group's trading, market power, and ability to control prices and restrict output." *Id.*

A successful claim under Section 1 of the Sherman Act requires "proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)(citations omitted). Plaintiffs allege the existence of a contract – namely, the clandestine agreements the defendants offered the HFTs to incentivize their trading – but they have not alleged *any* restraint on trade, let alone an unreasonable restraint on trade. According to the plaintiffs' allegations, the agreements between

the defendants and the HFTs, if anything, promote trade (at least amongst the HFTs).  Plaintiffs have not alleged that the occurrence of high frequency trading on the exchanges unreasonably restrains trading by regular investors and that is all the agreements promote.  Nor have plaintiffs alleged that the defendants endeavored in any way to fix prices.

To state a claim for violation of Section 2 of the Sherman Act, plaintiffs must plead: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, (1966); *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F.Supp.2d 880, 901 (N.D. Ill. 2011).  To state a claim of attempted monopolization, plaintiffs must plead: "(1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed at accomplishing this unlawful purpose, and ... (3) a dangerous probability that the attempt to monopolize will be successful."  *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989), *quoted in In re Dairy Farmers*, 767 F.Supp.2d at 901.

"Monopoly power is the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  "There are two accepted methods for proving that a defendant possessed monopoly power: (1) 'through direct evidence of anticompetitive effects;' or (2) 'by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case.'"  *In re Dairy Farmers*, 767 F.Supp.2d at 902 (quoting *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d

928, 937 (7th Cir. 2000)).  Plaintiffs have not alleged any facts concerning the relevant markets or defendants' share therein.  Nor have they alleged any facts to support their conclusory allegation of anticompetitive effects caused by the HFTs.

Plaintiffs' antitrust claims are predicated on the incentive agreements defendants made with HFTs and appear to be based on the allegations that defendants, by entering into clandestine incentive agreements with the HFTs, created barriers to entry for regular investors such as plaintiffs.  While this claim could potentially show that the HFTs had created barriers to entry to their competitors, it does not show that the defendants created barriers to entry for their competitors.  Indeed, plaintiffs are the defendants' customers every bit as much as the HFTs are the defendants' customers.  Thus, to the extent barriers to entry exist, they exist not for defendants' potential competitors but for defendants' customers. And to the extent the defendants would gain market share and monopoly power because of the business transacted by the HFTs, they would lose (under plaintiffs' zero-sum game theory) market share and monopoly power because of the business transacted by regular investors such as plaintiffs.

The "anticompetitive" strategies referenced in plaintiffs' complaint – wash trades, spoofing, etc. – were implemented, if at all, by the HFTs, not by the defendants.   Plaintiffs have not alleged that the defendants unreasonably restrained trade (in fact, they allege that defendants encouraged trade through the use of the incentive agreements); nor have they alleged that the defendants violated the antitrust laws by creating barriers to entry or otherwise attempting to create a

monopoly. Accordingly, plaintiffs' allegations fail to provide the factual content necessary for the Court to infer that defendants have violated any antitrust statute.

D.    Plaintiffs' Unjust Enrichment Claim

For their tenth cause of action, plaintiffs allege unjust enrichment. More specifically, they allege that defendants "financially benefitted from their unlawful acts" and that their "unlawful acts caused Plaintiffs and other members of the Class to suffer injury and monetary loss." Second Amended Complaint [25], ¶154. They allege that "it is unjust and inequitable for Defendants to have enriched themselves in this manner" and that each "Defendant should pay its own unjust enrichment to Plaintiffs and members of the Class." *Id.*, ¶¶155, 156.

As explained above, the Court has determined that plaintiffs have failed to state a claim for violation of any of the relevant statutes, and have failed to state a claim for fraud. As a result, plaintiffs' unjust enrichment claim, which is predicated on the alleged violations, fails as well. Without evidence of a statutory violation, there can be no evidence that the defendants were enriched (justly or unjustly) thereby. *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 801 F.3d at 765.

Conclusion

For the reasons explained above, the Court finds that plaintiffs' allegations, though voluminous, fail to state a claim against the named defendants for violation of the Commodity Exchange Act, the Sherman Act or the Clayton Act and fail to state a claim for fraud or unjust enrichment. A thorough parsing of plaintiffs'

allegations makes clear that plaintiffs' claims do not properly lie against the named defendants. As in *Barclays*, this Court's task is not to adjudicate the fairness or appropriateness of high frequency trading. The Court today assesses only whether the plaintiffs have stated claims for which relief may be granted. They have not. Accordingly, the motion to dismiss is granted and plaintiffs' Second Amended Complaint is dismissed.

Date: December 3, 2015

ENTERED:

J

United States District Judge